(No. 47482.─

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. SAMMIE GARRETT, Appellee.

*Opinion filed Nov. 25, 1975.─Rehearing denied Jan. 22, 1976.*

152

CREBS, J., took no part.

James J. Doherty, Public Defender, of Chicago (Dale W. Broeder, Vincent M. Gaughan and Matthew J. Beemsterboer, Assistant Public Defenders, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon, Thomas D. Rafter, and Patrick T. Driscoll, Jr., Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

In a bench trial in the circuit court of Cook County, defendant, Sammie Garrett, was found guilty of murder (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(2)) and unlawful use of weapons (knowing possession of a shotgun with a barrel less than 18 inches in length (ch. 38, par. 24—1(a)(7)). He was sentenced to concurrent terms of 20 to 40 years on the murder conviction and 1 to 5 years for the unlawful use of weapons. He appealed the murder conviction to the appellate court and while that appeal was pending filed a petition in the circuit court pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1969, ch. 38, par. 122—1 *et seq.*). The People's motion to dismiss the post-conviction petition was allowed and defendant

appealed. The appellate court consolidated the appeals for opinion, vacated the murder conviction, reversed the judgment dismissing the petition for post-conviction relief, and remanded both causes to the circuit court with directions to conduct a hearing in the post-conviction proceeding and enter either a new judgment of conviction of murder or an order granting defendant a new trial. (26 Ill. App. 3d 786.) We granted the People's petition for leave to appeal.

The evidence shows that on November 9, 1969, Karen Thompson, the deceased, was 28 years of age, married and the mother of two children. From August until November 9, Karen was enrolled at Prairie State College in a Wednesday evening class on Afro-American art and culture. Apparently it was at this class that she became acquainted with defendant. She was a Caucasian and defendant is a Negro. At the time of the trial, he was 21 years of age, married, had one child, was employed, and was also a part-time student at Prairie State College.

On Wednesday Karen usually left home between 6:30 and 6:45 p.m. and returned between 10 and 10:30 p.m. With the exception of one Wednesday, she had attended all her classes. On Wednesday, November 5, she left for class at the usual time. When she had not returned by midnight, her husband left home to look for her. She arrived home about 12:30 a.m. Her sister, 17 years of age, who lived with Karen and her family, testified that when Karen came home she was crying and appeared to be upset. Her husband returned home at about 1 a.m., and at that time found her still distraught. He asked her where she had been and she told him that she was having an affair with a man.

After that Wednesday evening and for the next two days, Karen was periodically depressed and talked of her desire to commit suicide. The cause of her distress was the recently exposed affair. She had been taking birth control pills and, after she confessed the affair, apparently started

taking a patent medicine for depressive moods.

The Thompsons had planned to meet with some friends from the Park Forest area, in Chicago, during the evening of Saturday, November 8. One of the friends telephoned them at about 1:30 that afternoon to inquire who would drive that evening. Karen talked with the friend and, after she hung up the telephone, she turned to her husband and said: "I can't face those people, I don't know."

Shortly before 4 o'clock that afternoon, Karen began packing her suitcase in preparation of leaving her husband and children. She told her husband where she was going. He took the children to a friend's home so that they would not see her leave. At approximately 4 or 4:15 a taxicab arrived at the home, her sister gave her $40, and Karen left in the cab. Her husband returned home at about 4:30 p.m., and did not see her leave.

The cab driver drove Karen to 211 East 16th Street in Chicago Heights. When she got out of the cab she was greeted by a man who resembled the defendant. At about 8:30 that evening the couple registered as Mr. and Mrs. James West of Los Angeles, California, into Room 5 of the Ford City Motel at State Street and Route 30 near Chicago Heights.

Shortly before midnight, Nathan Massengill, one of the owners of Kazak's Lounge, a tavern in Chicago Heights, saw the defendant and a white girl enter the tavern. The defendant had a package wrapped in a coat. Massengill saw what looked like the barrel of a shotgun. Massengill told defendant that he would "have to get out of here with that shotgun." Defendant said he was going as soon as he got a chicken dinner and Massengill told him he would have to leave now. Defendant left and the girl sat down. Defendant returned four or five minutes later, without the shotgun, and sat with the girl. When Massengill left the tavern approximately 10 minutes later, defendant and the girl were still there. Massengill was of the opinion

that the girl was under the influence of alcohol. He testified that he did not hear any gun shots or any loud noises which sounded like gun shots while he was at the tavern.

Ed Savage, who had known defendant for about two years, entered Kazak's Lounge about midnight, saw defendant sitting at a table with a white girl and joined them. He was shown a photograph from which he identified the girl as Karen Thompson. The three of them drank beer while defendant waited for the two chicken dinners he had ordered. Savage asked the girl her name, but she did not say anything. About 12:30 a.m. the three left the tavern. While Savage and the girl waited in front, defendant went into the alley behind Kazak's and got the shotgun which was wrapped in a green jacket. Defendant told Savage he found the gun in the alley but he did not tell him when he had found it. Savage drove the couple to the Ford City Motel. He stated that he did not hear any gun shots while defendant was in the alley, nor at any other time that night.

The next morning, defendant, his two brothers and two women went to a police station in Chicago, about 25 miles from the motel. Patrolman Joseph Oklapek, the assistant desk sergeant, testified that defendant told him that he had spent the night in Room 5 of the Ford City Motel with a white girl named Karen, that when he awoke he saw her lying on the floor; that she looked like she was dead; and that he left the motel room, went to his brother's house in Chicago and then went to the police station. Officer Oklapek notified the Cook County sheriff's police, which had jurisdiction of the unincorporated area where the motel was located.

Detective William Mitchell of the major investigation unit of the Cook County sheriff's police arrived at the Chicago police station at about 10:50 a.m. He "informed him [the defendant] of his rights." He and the defendant

got into the back seat of a police car, driven by another officer, and left for the Ford City Motel. Mitchell testified that during the ride defendant said that he was out with a young lady, Karen Thompson; that they were drinking and smoking "pot" at the Ford City Motel; that he fell asleep; that when he awoke, the young lady was lying in a pool of blood; that he had not heard any shotgun blast; that he dressed, picked up the shotgun, which was lying alongside the body, wrapped it in his coat, left the motel and hid the gun under a porch at his aunt's house. Mitchell testified that defendant said that he was with Karen Thompson and Ed Savage at 2:45 a.m. when he found the shotgun in an alley behind a "chicken eating place" at 319 Fifteenth Street, and that he had fired two shots there. Mitchell also stated that defendant said he did not want to see the victim and that he would show Mitchell where he found the shotgun and where he had hidden it.

Mitchell then proceeded to the alley behind the "chicken eating place" where he found one spent .12-gauge shotgun shell which was introduced in evidence. He then went to the home of defendant's aunt where, under the rear porch, he found a sawed-off, single-barrel .12-gauge shotgun wrapped in a green coat. There was tape in the middle of the barrel, taping it to the stock, and tape behind the trigger. There was a spent shell inside the shotgun. The shotgun and the spent shell were introduced in evidence.

Mitchell then took defendant to the Homewood District police station. His brothers were there and they told him that he should get an attorney. He did not say anything more to the police. Mitchell said that when they were at the Chicago police station he noticed that defendant had a little cut in the webbing of his hand between the index finger and the thumb, but he did not ask him how he got this cut.

At about the time that Detective Mitchell arrived at the Chicago police station to pick up defendant, patrolman

Richard Larson of the sheriff's police department, pursuant to radio direction, proceeded to the Ford City Motel. After talking to a maid he went to Room 5. The door was closed, but unlocked. The door was partially blocked by an object. He saw a woman's body lying on the floor, partially blocking the door. She did not move and he observed the wound on her head. He secured the room, radioed for a detective unit and waited for the detective unit to arrive.

Detective Robert Borowski, an evidence technician and firearms instructor for the sheriff's police, arrived at Room 5 of the motel about 10 minutes after patrolman Larson. He and Larson partially opened the door to the room, which was obstructed by the body, and squeezed into the room. Before he disturbed anything Borowski took eight photographs of the room, all of which were introduced in evidence.

The photographs show that the room was small and appears to be about 10 feet by 12 feet. The door to the room was at the south end in the west wall. A standard size double bed stood with its head against the east wall and extended almost to the north wall. Toward the foot of the bed, against the south wall, stood a small dressing table, with a mirror above it, and a chair. An upholstered chair stood in the northwest corner of the room.

On the bed were a coat, a brassiere, two pillows and a cover. A pair of men's shorts were on the upholstered chair. A paper bag lay on the floor next to that chair. A black suitcase was lying flat on the floor just to the left of the door. On the dressing table were three empty beer cans, an empty fifth wine bottle, an empty half-pint rum bottle, a half-empty bottle of Coca Cola, a container with a grass-like substance appearing to be marijuana, a book of matches, an ashtray, an unexpended .12-gauge shotgun shell, a woman's purse with Karen Thompson's identification in it, the remains of a chicken dinner on top of a paper bag, an uneaten chicken dinner in the paper bag,

another paper bag, and a note stipulated to be in Karen Thompson's handwriting stating: "I killed myself, Karen". Alongside the bed, on the south side, were several empty beer cans which do not appear in the photographs.

Karen Thompson's body lay on the floor, and apparently her head and left shoulder had been moved when the door was opened. The body was on its back, the legs straight, and slightly spread. The upper arms were straight out from the sides, the lower right arm bent at the elbow straight up parallel to the body, and the lower left arm bent at the elbow slightly down and back toward the body with the left wrist about seven inches off the floor. She was clothed in a pair of slacks and a long-sleeved, turtle-neck sweater. Her shoes were off. Her head lay in a large pool of blood which extended to her right and above her head. The entire brain was on the floor above her head and had apparently been split apart when the door was opened.

There was blood and tissue matter splattered on the walls and floor, most of it in the southwest corner of the room. There were no pellets embedded in the floor, the walls or the ceiling. Pellets were recovered from the floor and delivered to the crime laboratory. The room and items in the room were dusted for fingerprints, but the detective was not able to obtain clear prints. When Detective Borowski examined the body he observed no powder burns on the head or the hands and no abrasions, cuts, bruises or discoloration on the hands. He found a small amount of blood on them. He put plastic bags over the hands. There was no chemical analysis made for gun powder on the head or hands. He placed the brain tissue in a plastic bag for the coroner, and took blood samples for the coroner and the crime lab.

Detective Borowski stated that his duties as an evidence technician were to collect and preserve evidence at the scene of a crime, that he had been an evidence technician approximately 50 times and that 10 of these

occasions had involved a body found in a room. Based on his experience at preserving evidence at crime scenes, his examination of this "crime" scene and the splatterings on the wall, he offered the opinion that the "force exerted against the victim" was in a "south to southwest direction" and on a "downward path."

Dr. Edward Shalgos, a pathologist to the coroner of Cook County, performed an autopsy on the body the following day, November 10. He testified that as the result of his external examination of the body his findings "revolved only about the head wound" of shotgun character. He stated that "the entire vortex which is the roof aspect of the head extending from the forehead to the absolute back of the head and then from each ear region, right and left, was component of the shotgun wound" and that "there was a complete gaping opening—all of the bones and skin tissue were laid broadly open with an essential absence of the usual skull contents from the usual skull position." He said he "removed pellets and shotgun wadding from the separately presented brain which was the practically sole localization of the material." These pellets and wadding were introduced in evidence.

Dr. Shalgos was then shown People's Exhibit 30, a color photograph of the head after apposition (placing together) of the skin margins. This picture reveals an irregular rectangular shaped hole between the eyes about two inches wide and one inch high. He was next shown People's Exhibit 31, a color photograph of the right side of the head which reveals a second hole, approximately twice as large, at the right base of the skull. He was then asked the following questions and gave the following answers:

"Q: Now, Doctor, with regard to your examination of Karen Thompson and your external examination as well as your internal examination, did you make any findings with regard to the projectory of the force exerted upon Karen Thompson?

A: The projectory was backward from the front of the body, backward, toward the right, with suggestions of

a slightly downward course.

Q: With regard to the second hole, Doctor, namely the hole depicted in People's Exhibit 31, in your opinion, Doctor, does that hole show signs of entry or exit force?

A: Exit.

Q: With regard to the gaping hole in the forehead indicated in People's Exhibit 30, does that wound show signs of entry force or exit force?

A: Entry."

Dr. Shalgos said he looked for powder burns on the forehead skin tissue and did not see any. He stated that the cause of death was a "shotgun wound to the head lacerating the brain most profoundly."

The parties stipulated that if Dr. Fioresse was called as a witness he would testify that he is a physician specializing in the field of toxicology, that he examined the tongue and palate of the victim and removed from the palate and tongue area 10 to 18 pieces of an unknown substance, one of which he submitted to further chemical examination and determined to be lead.

John Sadunas, a firearms identification examiner for the Chicago Police Department, and Detective Borowski testified to the ballistics tests which they performed with the shotgun recovered by Detective Mitchell. Sadunas identified the empty shotgun shell found near Kazak's Lounge and the empty shotgun shell found in the chamber of the shotgun, the .12-gauge sawed-off shotgun, a pill box containing 34 No. 5 pellets found on the floor of the motel room, and the wadding and five No. 5 pellets which Dr. Shalgos had removed from the brain. He explained how he fired two test shots from the shotgun and microscopically compared them with the empty shells given to him by sheriff's detectives. It was his expert opinion that the empty shell found near Kazak's Lounge and the empty shell found in the barrel of the shotgun were both fired in the shotgun recovered by Detective Mitchell.

In evidence are 11 photographs of test patterns

made by firing the shotgun into blotting paper with stiff cardboard backing. The shells used contained "three gram equivalent powder" and one ounce of No. 5 shot, which are the same as the factory specifications for the expended cartridges found near Kazak's Lounge and in the barrel of the shotgun. The shots were fired at distances of 1, 2, 3, 4, 6, 8, 10, 12, 24 and 48 inches. Detective Borowski identified the dark area around the holes made in the blotting paper as the result of shots fired at 1, 2, 3, and 4 inches as powder burns, the dark area around the holes as the result of shots fired at 6, 8, 10 and 12 inches as gun powder, and the dark spread out specks at 24 inches as gun powder. There was no gun powder visible, or powder burns, as the result of a shot at 48 inches. The hole at four feet was also larger than the hole made at the shorter distances, and was about the size of that shown in the photograph of the decedent's forehead with the skin margins appositioned.

The shotgun was a single-barrel, single-shot, break-open model with a 15-inch barrel. Sadunas testified that the weapon had a loose stock which exposed the opening lever more, and had a tendency to cut the hand when fired in a conventional manner. He also described the strong recoil of the weapon. The witness was asked if he had an opinion "if this gun were fired thusly, and for the record I am pointing the weapon at my head, slightly downward, holding the hand grasp with my left hand grabbing the barrel, with my thumb in reverse fashion in the trigger housing, with my right fingers upon the top of the weapon, do you have an opinion as to whether or not the recoil of this weapon would in any way cause any hand injury?" Over objection, he answered: "I wouldn't know the extent of the damage to the hand but quite a bit would happen to it because of the jump or recoil." He was also asked if a person firing that weapon in that position would be able to hold on to it. He replied, "I doubt it."

Detective Borowski testified that when he saw defend-

ant on November 9 he noticed a cut on the webbing between his finger and thumb on his right hand. He said that he had sustained a similar injury which is caused by the locking mechanism of a shotgun and had observed a similar injury on Sadunas. The cuts to the hands of the witness and Sadunas were not caused by firing the shotgun in evidence here but by other shotguns. This witness was asked the same hypothetical questions asked of Sadunas. It was his opinion that the weapon fired in the reverse position described would probably injure the thumb and forefinger and that the person would not be able to hold on to the weapon.

The circuit court found defendant guilty of murder and in denying his motion for a new trial, stated: "Yes, the Court heard all of the evidence that had been offered and weighed and considered and the Court was then and is now convinced that under all of the facts and all of the circumstances and all of the conditions which were presented by that evidence, it would not have been possible for the deceased to have fired the shot herself."

As previously noted, although separately briefed, these appeals were consolidated for opinion in the appellate court and are consolidated in this court. We consider first the issues presented in the appeal from the conviction of murder. Defendant contends that the People failed to prove him guilty of murder beyond a reasonable doubt and that he was denied effective assistance of counsel.

The People contend that the circumstantial, ballistic and pathological evidence proved beyond a reasonable doubt that the deceased could not have pulled the trigger of the shotgun from which the fatal shot was fired, that defendant's statements to the police at the time of his arrest show that he and the deceased were the only persons in the motel room in which she was killed, and that defendant, therefore, was the person who fired the shot. The People argue that by his actions defendant committed the offense of murder even though the deceased may have

solicited him to kill her, or consented to being killed.

*Amicus curiae*, the South Suburban Bar Association, argues that in the absence of "medico-legal" proof that a culpable homicide occurred the People have failed to overcome the presumption of suicide.

The parties agree that when, as here, the conviction of murder rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis. *People v. Lewellen*, 43 Ill.2d 74; *People v. Willson*, 401 Ill. 68; *People v. Ahrling*, 279 Ill. 70; *Mooney v. People*, 111 Ill. 388.

It is defendant's position that the record does not support the conclusion that the deceased could not have fired the fatal shot and that the evidence is consistent with the hypothesis that the deceased's death resulted from a "contact" shot through the roof of the mouth, and not from a shot into her forehead at a distance of four feet.

Although the Pathological Report and Protocol of the coroner of Cook County were not offered in evidence they, together with a supplementary pathological report, are attached to defendant's brief, and reference has been made to them by both defendant and the People. These documents are public records and are admissible "as *prima facie* evidence of the facts, findings, opinions, diagnoses and conditions stated therein." (Ill. Rev. Stat. 1971, ch. 51, pars. 3.01 and 3.02.) We agree with the appellate court that judicial notice may be taken of their contents (ch. 51, par. 48b; see 26 Ill. App. 3d 786, 800 n.8). The pathological report prepared by Dr. Shalgos and attached to the protocol stated:

> "The mucosa over the hard palate right posteriorly shows approximately 2½ cm. (maximal) locus of blue-black discoloration whose appearances raise the question of a possible burn identity, this together with the tongue and regional right soft tissues being taken for possible powder burn analysis by Crime Lab.
>
> * * *

Crime Lab specimens *** included *** in formaldehyde the entire tongue as well as posterior pharynx soft tissues, and the discolored right posterior hard palate mucosa for possible powder burn study."

The supplementary pathological protocol, also prepared by Dr. Shalgos, stated:

"Examination of jar and content brought to me by Sheriffs' Police from Dr. Fiorese, which was originally removed by me at autopsy for my later examination, which could *not* be found after completion of autopsy or in extensive search the following day, and which was concluded as being lost in some unexpected way; *Belatedly*, months later, awareness (via receipt) of release to Sheriffs' Police by Dr. Kearns on day of autopsy, and transfer by them to Dr. Fiorese, impeding the anticipated and desired study by me, specifically for pellets, precise location (mouth vs. nasal aspect), possible powder or other burns on soft palate mouth aspect, etc."

In the direct examination of Dr. Shalgos, at trial, the following ensued:

"Q: Doctor, is there any reason why you removed the palate—tongue and the soft palate area of Karen Thompson?

A: In my autopsies in traumatic cases, I always remove the tongue and soft palate.

Q: And what type of analysis did you desire to subject these articles to?

A: I anticipated studying the tongue and the two aspects of the soft palate merely because of a desire for ultra thoroughness of appraisal.

I intended to evaluate further the identity of a dusky reddish central patch on the dorsum, the roof aspect in the back of the tongue, and a bluish black area on the right back aspect of the mouth side of the soft palate.

Q: And have you been able to make the analysis, Doctor?

A: I wasn't able to make that analysis. I have completed studies but I wasn't able to make the original analysis that I desired."

From these questions and answers the circuit court could have concluded that removal of the tongue and soft palate

was a routine procedure. It was not informed of the pathologist's initial observation "of blue-black discoloration whose appearances raise the question of a possible burn identity" (initial protocol); that the removal was "being taken for possible powder burn analysis by Crime Lab" (initial protocol); that the removal was for the "anticipated and desired study by me, specifically for pellets, precise location (mouth vs. nasal aspect), possible powder or other burns on soft palate mouth aspect, etc." (supplementary protocol).

On cross-examination, Dr. Shalgos admitted that there was "extreme explosive quality in the wound." He was asked if the result would be the same no matter how far or how close the weapon was held and he replied: "No, the results would vary but I generally do not have that information for correlative purposes. Therefore, I would not—I would prefer not to be absolute about that point." He would state no opinion as to whether the wound could have been self-inflicted. He stated, however, that the further the weapon from the entry wound, the larger the entry hole which results.

In argument of their respective interpretations of the evidence the parties have referred to a number of treatises which, appropriately, may be considered by this court. The writers appear to agree that the characteristics of an entry wound will vary with the distance from which a weapon is fired. (See Gonzales, Vance, Helpern, and Umberger, "Legal Medicine, Pathology and Toxicology," Appleton-Century-Crofts, Inc., 2d ed., pp. 381-451 (1954), hereafter Legal Medicine; Moenssens, Moses, Inbau, "Scientific Evidence in Criminal Cases," The Foundation Press, Inc., pp. 181-186 (1973), hereafter Scientific Evidence; Snyder, "Homicide Investigation," Charles C. Thomas, 2d ed., pp. 107-149 (1967), hereafter Homicide Investigation.) The characteristics of the wound which results are placed into three categories, based on distance. "A contact entrance wound may result from the

placement of the muzzle of the firearm on the skin of the victim at the time it was fired. A close (intermediate) bullet wound is considered as one in which the muzzle was held from 1 inch to approximately 20 inches from the point of entry at the time of discharge." (Scientific Evidence, p. 183; see also Homicide Investigation, p. 120.) "A distant bullet wound is deemed to result when the muzzle of the discharging firearm is over two or three feet from the point of entry." Scientific Evidence, p. 185; see also Homicide Investigation, p. 120—"18 inches or more."

A shotgun contact wound of the head may be devastating because of the explosive forces of the gases which enter the skull. (See Homicide Investigation, p. 129; Legal Medicine, pp. 448-449.) The evidence shows that here the skin was torn away from the skull, from the eye level up and back to the base of the skull, and from one ear to the other. There was a hole in the forehead approximately two inches in diameter, irregularly. Dr. Shalgos described this hole in the skull but the record contains no photograph of the forehead before apposition of the skin there. A photograph of the top of the skull shows the bone missing there and continuing down to the forehead. The brain is missing and viewed from the top of the head "the entire nasal pharynx [is] completely destroyed exposing the mouth completely." (Initial protocol, p. 1.) The pathologist noted "outer displacement of bones by an inner force." (Initial protocol, p. 2, par. 4.) Contact wounds made by a shotgun can be massive. (See Legal Medicine, p. 449.) Dr. Shalgos would state no opinion as to the distance from which a shotgun would cause such a wound.

Although the record contains photographs of test patterns made by firing the shotgun at various distances ranging from 1 inch to 48 inches, no test was made by firing the shotgun with the muzzle in contact with the blotting paper. The test patterns made by John Sadunas,

the firearms examiner, showed powder burns at 1 to 4 inches, powder residue at 6 to 24 inches and no powder burns or residue at 48 inches. These test patterns also show that with the increase in the distance between the shotgun and the target the entry hole grew larger. These characteristics are in accordance with close and distant firings of a weapon. (See Scientific Evidence, pp. 182-185; Homicide Investigation, pp. 120-133.) A contact entrance wound is large (see Homicide Investigation, pp. 120-121; Scientific Evidence, p. 184) and a contact shotgun wound could cause a hole the size of that found in the forehead of the deceased. See Legal Medicine, p. 448.

The test pattern made at 48 inches shows separate pellet holes around the main two-inch hole. "A shotgun held within one or two feet from the skin surface will make a large single hole. As it is moved farther away, its progressively expanding pattern of shot will result in multiple pellet wounds." (Scientific Evidence, p. 185; see also Homicide Investigation, pp. 128-137; Legal Medicine, p. 449.) People's Exhibit 30, which shows the deceased's face, after apposition, reveals no satellite wounds around the large hole, and Dr. Shalgos, who examined the skin around this hole, made no mention of satellite wounds.

Defendant contends that all of the evidence is consistent with a contact wound through the roof of the mouth, and not a shot into the forehead from four feet away. He argues that the destructive force of the shot and the lack of satellite wounds are inconsistent with a shot fired from a distance of four feet. The absence of burns around the forehead and the "blue-black area in the roof of the mouth" which Dr. Shalgos thought had a "possible burn identity" are consistent with defendant's theory. He also points to the pathological finding that "the lower mandible shows a midline through and through fracture and the central teeth are significantly loosened." This, he argues, could not be caused by a shot fired into the forehead from four feet away, but could have been caused

only by a shot fired with the shotgun barrel in the mouth. He argues that the holes in the forehead and back of the head which Dr. Shalgos described as showing signs of entry and exit force, respectively, are "out-shot" wounds and that the photographs which show a view of the deceased's mouth from the top of the head reveal an uneven line on each side of the hole in the top of the head. This, he states, is an indication of a separated midline suture which "could only have been caused by the force of expanding gases within the cranium, opposite the point of contact entry,— the roof of the mouth." Furthermore, he asserts that consistent with a contact wound through the roof of the mouth theory, the butt of the weapon would be pointed down, and in recoil the weapon would bounce on the floor and could land anywhere, including next to the body of the deceased.

The circuit court, over objection, permitted Officer Borowski and John Sadunas, the firearms examiner, to express their opinions that if the deceased had fired the weapon it would have injured her hand, and that she could not have held on to the weapon in recoil. This evidence had no probative value. (*People v. Willson,* 401 Ill. 68.) There is nothing to show that, if the deceased fired the weapon, she fired it in the manner demonstrated by the Assistant State's Attorney. Nor had either witness fired the weapon, or observed it fired, in the manner demonstrated by the Assistant State's Attorney.

The inference that the cut on the webbing between the index finger and thumb of defendant's right hand occurred when the shotgun was fired in the motel room is based on the testimony of Massengill and Savage that they did not hear a shot that night. While defendant went out, presumably to hide the shotgun in the alley behind the tavern, Massengill remained in the tavern where the juke box was playing. An expended shell fired from that shotgun was found in the alley the next morning. It is reasonable to assume that defendant had fired a shot there

sometime during that evening or he could not have directed detective Mitchell to the place where he found the expended shell fired from that shotgun. Whether defendant fired the weapon while he was hiding it in the alley, or at some other time, and whether Massengill would have heard the shot at the time he was hiding it, is pure speculation.

Under the circumstances of this case a test for nitrate on the deceased's hands, as well as on the skin on her forehead and on the roof of her mouth, might have proved of value. Although Detective Borowski wrapped the deceased's hands in plastic bags, presumably in preparation for such a test, it does not appear that the test was made. Although it appears questionable whether the test has achieved a sufficient degree of reliability to prove recent discharge of a firearm it has been said "As for the dermal nitrate test it cannot conclusively establish that one has fired a gun recently. However, negative results should indicate that one has not fired a gun recently unless he used a glove or other means of insulating his hand from the blast." Richardson, "Modern Scientific Evidence," The W. H. Anderson Company, 2d ed., p. 583 (1974).

Two matters concerning the condition of the body merit mention. On cross-examination Detective Borowski stated that there was a small amount of blood on the deceased's hands. A splash-back of blood has been noted on the hand of a suicide victim firing a contact shot. (See Legal Medicine, p. 418; Scientific Evidence, p. 184.) Second, it appears from the photographs and the testimony that the deceased's lower left arm was raised off the floor in a manner suggestive of having held the barrel of a shotgun. In a discussion of *rigor mortis* the authors of Scientific Evidence, at page 201, state: "A phenomenon known as cadaveric spasm adds another note of uncertainty to the variable onset of *rigor mortis*. It is characterized by instantaneous rigidity of the whole body or an appendage such as the hand gripping a weapon or a clump

of the assailant's hair or clothing."

It was argued at trial that defendant could have slept through the noise of the exploding shotgun shell because of the alcohol he had drunk and the marijuana he had smoked. In addition, the author of Homicide Investigation in discussing the noise produced by discharge of a firearm states, at page 144:

"The amount of noise produced by the firing of a gun depends upon many factors such as the type of powder, the size of the powder load, the length of the barrel and the velocity of the bullet. A fact that is commonly overlooked however, is that *when a firearm is discharged with the muzzle pressed tightly against the skin, little or no noise from the blast may be produced.* [Emphasis his.] I know of one instance where a person shot himself in his home and members of his family in the adjoining room with the door open did not hear the report of the gun. The reason for this is that if the muzzle is pressed firmly enough an effective seal is produced between the muzzle and the skin so that the entire blast of the discharge is expended within the body tissues."

The People point out that defendant's explanation for the presence of the shotgun is difficult to believe and argue that even if defendant fired the shot because Karen Thompson desired to die, he nevertheless committed murder. Also suggested is that their illicit romance, doomed from its inception, gave rise to a murder-suicide pact and that after defendant shot the deceased he did not, as agreed, use the unexpended shell found in the room, to commit suicide.

On this record, concerning the question why defendant took a shotgun and shells to the motel room, we enter a completely speculative area. Similarly speculative is the question why, although she had talked of suicide, the deceased took a suitcase of clothes and $40 when she left

her home. It does not appear, however, that defendant's taking the deceased and the shotgun into a tavern where he seems to have been known is consistent with an intent to commit murder.

Although it would appear from the testimony of her husband and the admittedly voluntary suicide note found in the motel room that Karen desired death there is no evidence whatsoever that defendant shared her wishes. We have considered the People's theory that the couple had a suicide pact and that after defendant shot her he changed his mind about shooting himself and fled. It would seem, however, that had there been a suicide pact motivated by the Romeo-Juliet type love affair suggested by the People, the suicide note should have read "We killed ourselves. Karen—Sammie."

We need not engage in conjecture concerning the reasons for the defendant's having brought the shotgun into the motel room. On this record, equally consistent with the hypothesis of intended homicide, is the hypothesis that defendant felt it necessary to have a weapon while he was with a woman who had just left her husband to be with him; or as unlikely as it may seem, he may, as he told the police, have actually found the shotgun.

Nor under the circumstances of this case can an inference of guilt be drawn from the fact that defendant left the motel room and hid the shotgun. The evidence is equally consistent with the hypothesis that these were the actions of an innocent man acting in panic. The defendant was a 21-year-old, married, black man who had spent the night in a motel room drinking and smoking marijuana with a white woman who had just left her husband to be with him. He saw her dead, her head in a pool of blood, her brain lying on the floor and blood and tissue matter splattered over the walls and floor, and it was the illegal weapon known to be in his possession the preceding night which had caused this devastating scene. Whether he awoke to this or saw it happen, his panic would be

understandable. Within hours, and before the police were aware of the occurrence, however, he reported it to them. Then over repeated *Miranda* warnings, he told the police that he had spent the night with the deceased in the motel room drinking and smoking "pot," that he had the shotgun earlier in the evening, that he had taken it from the motel room and he showed them where he had hidden it. He did not suggest that her death was suicide. He did not tell the police of the suicide note, nor does the record show that he knew it was there.

In *People v. Manske,* 399 Ill. 176, the court said that in a trial for murder the *corpus delicti* "consists of two parts or essential elements,—the fact of death, and the fact that death was produced by the criminal agency of some person. (*People v. Bentley,* 357 Ill. 82; *People v. Hanson,* 359 Ill. 266.) Both of these elements must be established beyond a reasonable doubt." (399 Ill. 176 at 183.) From our examination of the record we conclude that the evidence fails to prove, beyond a reasonable doubt, that Karen Thompson's death "was produced by the criminal agency of some person." Further, we are of the opinion that the evidence fails to exclude the reasonable hypothesis that the deceased succeeded in accomplishing the intent expressed when she wrote "I killed myself, Karen." Because we hold that the conviction of murder must be reversed we do not reach the issues presented in the appeal from the dismissal of defendant's post-conviction petition. For the reasons stated the judgment of the appellate court is reversed. The judgment of the circuit court finding defendant guilty of murder is reversed and its judgment dismissing the post-conviction petition is affirmed.

*Appellate court reversed; circuit court affirmed in part and reversed in part.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.