THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ORVILLE SMITH *et al.*, Defendants-Appellants.

Second District    No. 78-115

Opinion filed July 2, 1979.—Rehearing denied August 8, 1979.

Mary Robinson and Richard Cunningham, both of State Appellate Defender's Office, of Elgin, for appellants.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (John T. Elsner, II, Assistant State's Attorney, and Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant Laures Smith was convicted of the offenses of reckless conduct and obstructing justice, and the defendant Orville Smith was convicted of the offenses of perjury and obstructing justice, in a consolidated jury trial. Each defendant received two concurrent sentences of two years probation. Both appeal, contending that they were deprived of a fair trial and that they were not proven guilty of the respective charges beyond a reasonable doubt.

The charged offenses arose out of incidents which occurred on May 1, 1976, as the outgrowth of previously unfriendly relations between the defendants and their neighbors, Mr. & Mrs. Baur. The Baurs had previously filed a complaint as to sanitary conditions at the Smith home with County Health officers; and earlier on the same day of May 1 had filed a complaint involving an alleged assault on the Baur daughter by a guest of the Smiths.

There was testimony that at approximately 7:30 p.m. on May 1, 1976, while Mr. Baur was seated on a rider tractor mowing his lawn, Mrs. Smith motioned for him to come over to the fence which divided their properties but he "waved her off." Baur testified that Mrs. Smith "screamed" an obscene epithet at him, then entered her house. Shortly thereafter Baur testified that he heard what he characterized as "hysterical screaming" by Mrs. Smith's son and daughter, who had emerged from the front door of the Smith residence, but he continued to drive his tractor. Shortly after this, he observed Mrs. Smith on the back porch of her residence and then heard two shots. He said he saw Mrs. Smith on the porch prior to the shots and when he looked, after the shots, he saw that she was on the porch with both hands on the handle of a gun or possibly one on the handle and the other on her wrist. He was momentarily shocked, then jumped off the tractor and ran towards his home. The police were called and said that they found Mr. Baur, who suffered from hypertension, very pale, perspiring and upset.

An officer, informed by Mrs. Baur that Mrs. Smith had shot her husband, then went to the Smith residence where other police had arrived. Deputy Simpson testified that Mrs. Smith ordered him to leave her property and became very belligerent, that he then placed her under arrest, advised her of her rights and removed her to the rear of his squad car. He said that Mrs. Smith at this point made a derogatory comment using an obscene epithet about the police. He requested her permission to search her premises and after some further discussion she consented.

Although a number of guns were found at the residence none had been recently fired. One of the officers testified that Mrs. Smith told him that some children had been playing in the yard with firecrackers and that

she had heard a firecracker explode. She also told him that "she hits what she shoots at because she is a Kentucky woman."

Shortly after the search an officer spoke with Orville Smith over the telephone and asked him if he owned a .38 snub-nosed gun. The officer testified that Smith replied that he did and stated that he would return home immediately and find the gun. He again indicated he would find the gun when he returned home, but before he began his search he had a conversation with his wife. After this conversation he told the officer that he did not have the .38 snub-nosed gun in the house but rather it was "out of state."

Don Saccomonto, 14 years old, testified that he was a frequent visitor at the Smith residence and that he was in the kitchen at about 7:30 p.m. on the evening of the incident. He stated that he heard Mrs. Smith shouting at Mr. Baur; that after Mrs. Smith entered the house she immediately went to her bedroom. He was talking to the Smith daughter, Bonnie, in the kitchen and she followed her mother toward the bedroom. Saccomonto testified that she returned to the kitchen area and told him "my mother is getting a gun." He said he then entered the hallway area and saw Mrs. Smith holding a gun in one hand and loading it with the other; saw her leave her bedroom, walk through the hallway and kitchen and onto the back porch, run to the front of the house and exit to the front lawn; and at this time he heard two shots fired. On cross-examination Saccomonto testified that after hearing the shots he heard Mr. Baur say "Go ahead, shoot me." He said that shortly thereafter he asked Bonnie if she knew where the gun that had been used had been placed but that she said she wasn't going to tell him. He said that later Debbie Howery, a friend of the Smith children, told Saccomonto that the gun was in a pocket in a coat which was hanging on a door in Mrs. Smith's bedroom. He sought to retrieve the gun from that place but found no gun there.

There was further testimony that shortly after the police arrived at the Smith residence Mrs. Smith asked her daughter Bonnie to go to a store to purchase cigarettes and that Bonnie left with her friend Darlene Howery. Darlene Howery testified that after they had walked a couple of blocks from the Smith residence Bonnie removed a hand gun from her stocking; the two girls then began to hit the gun with a rock endeavoring to destroy it but thereafter Bonnie picked it up again and continued walking. After a short while Bonnie stopped and with the assistance of Darlene dug a hole and buried the gun.

Mrs. Smith testified that when she drove into her driveway on the evening of the day in question she informed Baur that she was going to sue him and that he became very insulting whereupon she challenged him to leave his mower and come over into the Smith driveway and repeat his

comments. She said she then entered her house through the back door and found her daughter Bonnie and Don Saccomonto there. At that time she heard her daughter tell her that the police had arrived. She thought this was connected with the supposed assault on Mrs. Baur's daughter by Saccomonto and Bonnie. She denied she shouted obscene epithets at the police. She also testified that her husband does own a .38 snub-nosed hand gun but that it had been in Kentucky since about two years before the incident of May 1, 1976.

Bonnie Smith corroborated Darlene Howery's testimony regarding their attempt to destroy the weapon but testified that neither her mother nor her father suggested to her that she remove the gun or told her to hit it or destroy it. Rather she said that the plan to hide the gun originated with Don Saccomonto. She also denied that she had told Saccomonto that her mother was getting a gun and said she never saw her holding a gun on the day in question.

Mr. Smith also testified that he stated on the day in question that he did not have a .38 snub-nosed gun in his possession, that he owned such a gun but that it was with his family in Kentucky and had been so for two or three years. He identified the gun which was retrieved from the place where Bonnie and Darlene had hidden it as a .22-caliber weapon. He admitted on cross-examination that he had told the policeman in the telephone conversation that he had the .38 gun in his possession.

### *The charge of reckless conduct against Laures Smith*

■■ "A person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs recklessly the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful." (Ill. Rev. Stat. 1975, ch. 38, par. 12—5(a).) Here the jury could properly conclude from credible evidence that this offense had been committed beyond a reasonable doubt. Baur testified that after he heard the two shots he looked at the back porch and saw Mrs. Smith there with a gun in her hand which he said was pointed in his general direction. Mrs. Baur also stated that when she ran out the back door after she heard the shots she saw Mrs. Smith with a gun in her hand "kind of weaving around." This testimony was impeached in some details by the testimony of the deputy that Baur had told him on the day of the incident that he saw "what appeared to be a barrel sticking out from around the corner of the house with a hand on the end of it," and that Mrs. Baur did not say anything on that day about having seen Mrs. Smith with the gun. However, the jury could find from the evidence that Mrs. Smith did fire a gun and that the incident was traumatic to Mr. Baur. The testimony of the Baurs and of Saccomonto, even though impeached to

some extent, was consistent with the fact that Mrs. Smith and Mr. Baur just had a violent argument and constitute further circumstances from which the jury could find beyond a reasonable doubt that Mrs. Smith fired a loaded weapon of some kind in the general direction of Baur. The trier of facts, of course, could weigh the conflicting evidence and the credibility of the witnesses, and we will not disturb the verdict when the evidence, as here, is not so improbable as to raise a reasonable doubt of guilt. *People v. Manion*, 67 Ill. 2d 564, 578 (1977).

## *The charge that Laures Smith obstructed justice*

■■ The charge of obstructing justice (Ill. Rev. Stat. 1975, ch. 38, par. 31—4(a)) against Mrs. Smith is based on the allegation that with the intent to obstruct the prosecution of herself she knowingly concealed a .38-caliber revolver. There does not, however, appear to be any direct evidence in the record supporting that allegation. Darlene Howery testified that neither Mr. nor Mrs. Smith told her or Bonnie to hide the gun. Bonnie Smith testified that she decided, on the basis of a suggestion made by Saccomonto, to remove the gun in question from the house. The State argues that the circumstantial evidence indicates that Mrs. Smith was behind the scheme of getting the gun out of the house; that it is not reasonable to assume that a 14-year-old girl would do this on her own initiative. However, where a conviction rests solely on circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis consistent with innocence. (*People v. Garrett*, 62 Ill. 2d 151, 163 (1975); *People v. LaGardo*, 59 Ill. App. 3d 780, 784-85 (1978).) Here the jury, under the duty to resolve all facts and circumstances on the theory of innocence if that reasonably may be done (*People v. Sheppard*, 402 Ill. 347, 352 (1949)) could well have considered it reasonable that Bonnie Smith thought she could help her mother by removing what she supposed to be incriminating evidence from the residence without attributing the scheme to Mrs. Smith. The conviction of the defendant Laures Smith of the offense of obstructing justice must therefore be reversed.

## *The charge of obstructing justice against the defendant Orville Smith*

Orville Smith was charged with obstructing justice on the basis of allegations that he, with the intent to obstruct the prosecution of Laures Smith, knowingly concealed a .38-caliber revolver and knowingly furnished false information to the police.

■■ The State's evidence indicated that Orville Smith went with Darlene and Bonnie and two other persons to retrieve the gun from the place where Darlene and Bonnie had hidden it a few hours before. After retrieving the gun Smith and his party returned to the Smith residence.

Saccomonto testified that Mrs. Smith examined the gun after returning home and said, "This gun will never work again." It appears that the police were acting on a tip (by Saccomonto) that a .38-caliber gun was involved in the incident. Saccomonto testified that a .22-caliber gun introduced by the defense at trial was not the gun that Mr. Smith retrieved that night. Saccomonto further testified that after Smith exhibited the gun to several other persons who were present, he put the gun on a dresser and that Saccomonto never saw the gun again. It was never made clear even in the State's version when Mr. Smith is supposed to have done the concealing. There is no evidence in the record that the police later sought to search the residence or were frustrated in doing so by Mr. Smith's action. Even if Saccomonto's testimony is true, that Smith retrieved the .38-caliber gun from the place where Bonnie and Darlene had placed it, there is no evidence that Smith did anything after this time to conceal the gun. The evidence does not therefore support this portion of the indictment.

■■ There is some circumstantial evidence to support the further theory that Smith may have obstructed justice by telling the police that he had a .38-caliber revolver at home and he would find it for them, coupled with the fact that after he spoke with his wife he remembered that the gun was at his father's residence in Kentucky. However, Saccomonto, the only witness that testified that it was a .38-caliber revolver that Mr. Smith retrieved from the place where the girls had hidden it, admitted in cross-examination that the gun could have been a .32-caliber rather than .38. The circumstantial evidence, though highly suspicious, does not warrant the conviction since it did not so thoroughly establish the guilt of the accused as to exclude every reasonable hypothesis of his innocence. *People v. Dougard*, 16 Ill. 2d 603, 607 (1959).

We conclude that the People have not proved Mr. Smith guilty beyond a reasonable doubt of committing the offense of obstructing justice.

### The charge of perjury against Orville Smith

The basis of the perjury indictment (Ill. Rev. Stat. 1975, ch. 38, par. 32—2(a)) was that the defendant lied to the Du Page County grand jury under oath when he told them that the .38-caliber gun had gone to his father in Kentucky about three or three and a half years before.

■■■ There was no evidence, direct or circumstantial, that Smith had not given a .38-caliber revolver to his father in Kentucky prior to the incident. If he possessed a revolver that looked like a .38 but was of a slightly different caliber his answers to his interrogator could not be charged as an act of perjury. Since the only witness who impugns the truth of Smith's grand jury testimony, Don Saccomonto, stated during his testimony that

the gun may not have been a .38 but rather a .32, the State has not met its burden of proving beyond a reasonable doubt that defendant Orville Smith committed perjury. In a perjury prosecution the State must show that the response is factually false and not merely based on an erroneous or illogical conclusion. (*People v. Toner*, 55 Ill. App. 3d 688, 694 (1977).) The defendant cannot be convicted of perjury for a truthful answer to a question subject to various interpretations. (*People v. White*, 59 Ill. 2d 416, 420 (1974).) The conviction of the defendant Orville Smith for perjury must also be reversed.

### The claim of trial error made by both defendants

■■ The defendants have argued that the trial judge erred when he denied the jury's request for a review of the testimony of six witnesses and a later second request for the "legal definition of perjury" both outside the presence of the defendants and their lawyers. The decision to permit or deny a jury's request during its deliberations for a review of testimony is within the sound discretion of the trial court. (*People v. Pierce*, 56 Ill. 2d 361, 363-64 (1974).) While in view of the conflicting stories told by the numerous witnesses it might have been better practice for the trial court to have allowed a review of the transcripts of testimony, it was not a clear abuse of discretion.

■■ ■ Further, a hearing on the issue of whether to grant a jury's request to review transcripts of testimony is not a proceeding that involves the defendant's "substantial rights." (*People v. Pierce*, 56 Ill. 2d 361, 365 (1974).) Article I, section 8 of the Illinois Constitution as well as the Sixth Amendment guaranteeing the right of an accused to appear and defend in person by counsel and to meet witnesses face to face is not violated by hearings held outside defendant's presence in which substantial rights of the accused are not considered. *People v. Woods*, 27 Ill. 2d 393, 395 (1963); *People v. Grigsby*, 47 Ill. App. 3d 812, 816 (1977).

The defendants' complaint that the State was allowed to make repeated use of improper hearsay testimony is not supported. The complained of testimony was not objected to at the time of trial nor was it, or any part of it, assigned as error in the post-trial motions. Further, the error if any in admitting the testimony does not rise to the level of plain error. We have reached the same conclusion as to the claimed improper closing argument of the prosecutor.

The defendant Orville Smith has also claimed error in instructions to the jury on the charge of obstructing justice. In view of our disposition of the case we need not reach this contention.

The judgment of conviction and sentence of Laures Smith for reckless conduct is affirmed. The judgment of conviction of Laures Smith for obstructing justice is reversed, and the sentence as to that offense is

vacated. The judgments of conviction of Orville Smith for perjury and obstructing justice are reversed and the sentences vacated.

Affirmed in part, reversed in part.

RECHENMACHER and LINDBERG, JJ., concur.