THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PRINCE A. BURNS, Defendant-Appellant.

First District (5th Division)    No. 78-2019

Opinion filed February 15, 1980.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago (Robert Habib, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Jeremiah W. Lynch, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and sentenced to not less than 20 years nor more than 40 years. He contends on appeal that (1) he was not proved guilty beyond a reasonable doubt; and (2) he was denied a fair trial by comments of the State in closing argument which he asserts were unsupported by the evidence.

Rose Burns, wife of defendant, died as a result of a bullet wound in the neck, and it is undisputed that defendant gave police officers three separate accounts as to his activities the evening of the occurrence. He first told the police that he was at home when his wife's nephew called about 9:45 p.m. and requested the loan of his car, which he refused; that shortly thereafter, he decided to loan the car and, at about 10 p.m., he drove to his sister-in-law's home but the nephew had already left; that he (defendant) then returned home around 10:45 p.m. and found his wife lying dead on the bedroom floor; and that he believed she had committed suicide or that someone had broken into the house and killed her.

After his arrest, defendant told police investigators that he had driven to Mattie's Lounge at about 4:45 p.m. that day and borrowed the owner's car to keep a date with a woman he was to meet at a bingo parlor; that on his way to the parlor, he changed his mind on two occasions, deciding each time to go to another parlor; that he then returned the car, because it was becoming late, and went home; that his wife's nephew telephoned and asked to borrow his car; that he refused the request and his wife did also; that later he changed his mind and drove to the home of his sister-in-law to allow the nephew to use his car, but the nephew was not at home; that while there, he told his sister-in-law that his wife was acting crazy; and that when he returned home, he found her dead.

After officers pointed out discrepancies in his second account of events that evening, defendant then told them that during a quarrel with her about another man she was seeing, she drew a revolver and aimed it at

him; that during an ensuing struggle the gun was discharged twice and, after the second shot, they both fell to the floor; that the gun was in his hand at that time, and he placed it next to his wife's hand; that he found a bullet on the bed, which he flushed down the toilet; that he removed his tee shirt, which had blood on it, and threw it down the basement; that he then went to his sister-in-law's home and later, when he returned to his home, he called the police. Shortly after giving this account, he told substantially the same version to an assistant state's attorney.

At trial, a police officer testified that when he and his partner went to defendant's residence on the evening of the shooting, they were directed to the front bedroom where they saw decedent lying on her stomach, parallel to the bed, in a pool of blood.

A homicide investigator who came to defendant's home at 11:05 p.m. that evening testified he observed a female body lying on its stomach under a small table against the north bedroom wall; that there was a bullet hole in the cork and formica table; that there was a large pool of blood on the floor extending from the victim's head to her knees; that the top of the decedent's head rested on the baseboard of the north wall, where there were spatters of blood and what appeared to be the mark of a bullet hole on the baseboard; that on the victim's back there were "a couple of large pieces" and some small particles of cork from the bottom of the table; that decedent's head was directly under the bullet hole in the table; that the bullet entered the top of the table, as was indicated by the fact that the hole was smaller at the top of the table than at the bottom; that the victim had a bullet wound to the left side of her neck; that a .32-caliber revolver was found lying in a pool of blood next to the right hand of the victim; and that there was no indication of forcible entry of the premises.

An evidence technician testified, in pertinent part, that he observed the victim's body lying parallel to the bed in the front bedroom in a pool of blood and alongside a revolver; and that no fingerprints were found on the gun. Dr. Choi, a medical examiner, testified that his autopsy revealed a gunfire related wound under her chin which had a smoke deposit and a tattooing mark around it; that the nature of the wound indicated that the gun barrel was not in contact with the body when it was fired; that an internal examination revealed that the bullet traveled "frontward to backward" after entry, severing the carotid artery and fracturing the cervical vertebrae; and that such a wound to the carotid artery would cause instantaneous death.

Defendant testified, in pertinent part, that after the phone call from his wife's nephew on the evening of her death, he went into her bedroom to get some soap from a dresser drawer and, when he approached the dresser, she pulled a gun from it and said, "I am tired of you"; that she was

holding the gun in her left hand and, when he grabbed her left arm and twisted it back, the gun went off and the bullet went through a table; that a struggle began, during which they slipped on a rug and the gun went off a second time with the bullet striking his wife; that he fell against the bed and then fell on decedent; that she had fallen on her side, and he shook her in an attempt to revive her; that he put his hand against her chest but found no heartbeat; that he removed his tee shirt, which had blood on it, and threw it down the basement; that he washed his hands and then went to his sister-in-law's house and, while there, told her that his wife was acting crazy; that upon his return home he found a bullet on the bed, which he flushed down the toilet—after which he called the police. Defendant admitted that he lied when he told the police that he first found his wife dead after returning from his sister-in-law's house and that he believed she had committed suicide. He also admitted lying to the police when he told them that he had a date with a woman to play bingo on the evening of the shooting, but he denied ever having his hand on the gun or that he placed it next to his wife's hand.

OPINION

Defendant first contends that his guilt was not proved beyond a reasonable doubt "where the only physical evidence against him was consistent with the defendant's testimony concerning the death of the deceased." We disagree.

■■ Initially, we note that a court of review will not disturb the jury's determination of guilt unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Rolon* (1979), 71 Ill. App. 3d 746, 390 N.E.2d 107.) However, where a murder conviction rests solely on circumstantial evidence, the defendant's guilt must be so thoroughly established as to exclude every other reasonable hypothesis consistent with his innocence. *People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753; *People v. Smith* (1979), 76 Ill. App. 3d 191, 392 N.E.2d 682.

Here, a homicide investigator testified that he found decedent's body lying on its stomach under a small table between the bed and dresser; that the table, made of cork and formica, had a bullet hole in it; and that on decedent's back there were "a couple of large pieces" of cork as well as small cork particles which came off the bottom of the table. This would indicate that decedent's body was already on the floor under the table when the bullet penetrated the table—which, of course, is inconsistent with defendant's testimony that he and decedent fell to the floor after the second of the two shots was fired.

We are not persuaded by defendant's argument that the presence of the cork fragments on decedent's back is not inconsistent with his testimony because pieces of cork could have been scattered about the room when the initial bullet went through the tabletop and might have adhered to her back when he shook her in an attempt to revive her after she fell to the floor. Not only was there no testimony (as defendant conceded at oral argument) that decedent was ever on her back after the second shot was fired, but also the presence of "large pieces" of cork negates defendant's assumption that cork stuck to decedent's back as he attempted to revive her and, in fact, suggests that there was no such attempt.

Inconsistency with an accidental shooting appears from (a) the fact that after defendant realized his wife was dead, he went to his sister-in-law's home, told her that decedent was acting crazy and, upon his return home, flushed down the toilet a bullet he found on the bed; (b) his admission at trial that the first two accounts he gave the police as to what had occurred were not true; and (c) the fact that in both the third statement he gave to the police and in his statement given to an assistant state's attorney, he said that he placed the gun next to the decedent's hand—which contradicts his testimony that he did not have the gun in his hand.

Moreover, defendant's guilt is further demonstrated by other physical evidence; namely, that when she was found on her stomach under the table her head was directly under the bullet hole in the table; that she was killed by a bullet which entered the left front side of her neck; that, according to Dr. Choi, the nature of the wound indicated the gun was not in contact with decedent's skin when fired; and that her head was against a wall baseboard which had blood spatters on it as well as what appeared to be a bullet strike mark.

■■ Defendant also asserts that he was denied a fair trial by statements made by the State in closing argument that (a) the angle of the bullet which killed decedent was "straight back" and (b) that the absence of fingerprints from the gun established that defendant wiped the weapon after the shooting. The State is afforded a great deal of latitude in making the closing argument (*People v. Dykes* (1978), 66 Ill. App. 3d 403, 383 N.E.2d 1210; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847), and it may comment upon all facts which have been properly admitted into evidence and may draw all reasonable inferences therefrom (*People v. Ross* (1978), 63 Ill. App. 3d 884, 380 N.E.2d 897; *People v. McTush* (1978), 61 Ill. App. 3d 214, 377 N.E.2d 1148).

Defendant first argues that there was no evidence to support the repeated comments by the prosecution during closing argument that the angle of the bullet which killed decedent was "straight back." It is

defendant's position that Dr. Choi's testimony as to the bullet traveling "frontward to backward" does not support the comment of the State that the bullet went "straight back." This is significant since the State argued that defendant's testimony was unbelievable because if he and his wife had been struggling when the fatal shot was fired (as defendant said), the angle of the bullet could not have been straight back. Dr. Choi testified that the bullet penetrated decedent's neck on the left front, under the chin, and struck the carotid artery and the cervical vertebra. On cross-examination, the following colloquy took place between this witness and the defense attorney:

> "[Defense counsel]: Now, as you have described on direct examination the bullet traveled from frontward to backward after entry?
> [Dr. Choi]: Yes."

The witness was not questioned to further clarify this statement, and we believe it could be reasonably inferred from it that the angle of the bullet was straight back.

We see no merit in defendant's argument that we should not encourage the State's creation of "an artificial inference" to support their theory when the bullet's path could have been described by its witness. No authority is cited for this position, and it is apparent that defendant also could have established the course of the bullet in his cross-examination.

Secondly, defendant asserts he was denied a fair trial in that the court erroneously overruled his objection to the following prosecution comments in closing argument: "There are no prints on the gun. Why are there no prints on the gun? Could it be that Prince Burns had done a little more tidying up before the police had arrived?" It is defendant's position that this statement is unsupported in the record and was prejudicial in that it infers defendant wiped the gun of prints—which contradicts his testimony that he did not handle the gun.

It is undisputed that the technician found no fingerprints on the gun and that defendant did some "tidying up" after the shooting, as demonstrated by his testimony that he threw his bloody tee shirt down the basement after which he washed his hands, and that later he flushed a bullet down the toilet. Furthermore, defendant's testimony that he did not touch the weapon is contradicted (a) by his separate statements to the police and an assistant state's attorney that he placed the gun next to his wife's hand, and (b) by the fact that the revolver was found lying in a pool of blood next to decedent's right hand when, from the totality of the testimony, it could reasonably be inferred that decedent was lying on the floor under the table when she was struck by a bullet shot through the

table by defendant. We conclude that the statement in closing argument concerning the prints was a reasonable inference from the evidence.

The appellate court, in *People v. Roberts* (1971), 133 Ill. App. 2d 234, 240, 272 N.E.2d 768, 774, in reaching a similar conclusion, stated:

> "In the absence of evidence supportive of his theory it would therefore be improper for the prosecutor to argue to the jury that defendant wiped the gun rendering it free of fingerprints and other foreign matter. [Citation.] * * * In the present case, however, the gun was found free of fingerprints and foreign matter. Such was the testimony of the rebuttal witness called by the State as to his observations at the crime scene. We cannot agree with the defendant when he states a mistrial should have been granted on this point where evidentiary foundation of the prosecutor's argument [that defendant wiped the weapon] is found."

We believe that this analysis applies here.

For the reasons stated, the judgment is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.