THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARK JOHNSON, Defendant-Appellant.

First District (4th Division)    No. 78-2000

Opinion filed December 31, 1980.—Rehearing denied April 6, 1981.

Zimmerman & Unger, of Chicago (Arthur H. Zimmerman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Thomas A. Gibbons, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Mark Johnson, was convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and was sentenced to a prison term of 6 to 10 years.

On appeal, defendant contends reversible error occurred when (1) the State failed to prove him guilty beyond a reasonable doubt; (2) over objection, the trial court allowed a composite drawing of unknown origin to be admitted into evidence; and (3) the trial court allowed the State to introduce hearsay evidence.

We affirm.

At trial,[1] Charles Dzik, the complaining witness, testified that on June

---

[1] Defendant and Darryl Hedlund were charged with armed robbery. The indictment as to Hedlund was *nolle prossed* and he was granted immunity.

10, 1975, he was managing the Ponderosa Steak House located in Hazel Crest, Illinois. The restaurant closed to the public at 9 p.m. on June 10. At approximately 11 p.m., after turning off the restaurant lights and turning on the alarm in the office, Dzik exited through a side door of the restaurant. Dzik then proceeded through the parking lot to his car which was parked approximately 25 feet from the restaurant. The parking lot was equipped with mercury-vapor lights which were lighted. As Dzik walked, he heard "rustling" in the trees located behind his car. He continued walking when suddenly two men "walked out of the trees" towards him. At this point in time, the men were 15 feet from him.

Dzik further asserted he noticed that one of the men walking towards him was pointing a gun at him. When Dzik was approximately five feet from the men, one of the men told him to turn around and to stop looking at them. Dzik continued slowly walking as did the two men. When they were two or three feet away, Dzik turned around. Dzik stated he had been facing the men "close to a minute."

One of the men told Dzik to walk back towards the restaurant. When they reached the side door, he was ordered to open the door. The two men were standing behind him and, for "at least ten seconds," he saw their reflections in the upper glass portion of the side door. Dzik identified the defendant as one of the two men.

Dzik further asserted that after he informed the men that the door keys were on the hood of his car, defendant remained with him while the other man went to get the keys. After the man returned, Dzik opened the side door. The man told him to go to the office. As Dzik entered the office, defendant told him to turn off the alarm and open the safe. Dzik did so. Defendant then told him to go into the kitchen and not to look at them. Defendant went with Dzik into the kitchen and told Dzik to lie down on the floor. After Dzik complied, defendant "straddled" his back and placed a gun at the back of his neck. During this five-minute period, defendant pulled the gun's stop slide back and forth.

The other man came into the kitchen and indicated he had obtained everything. They then told Dzik to close his eyes and crawl into the walk-in cooler. After he crawled into the cooler, he was told to throw his wallet out, which he did. The men tossed him a steak knife, shut the cooler door and locked it. Dzik waited approximately one minute and then used the safety mechanism to open the cooler door.

Dzik then called police. He noticed the contents of the safe—approximately $1,400—were missing. After the police arrived, Dzik described his assailants as approximately 5 feet 9 inches tall and 145 to 155 pounds. They had shoulder-length hair and wore denim shirts and trousers. Both men wore sunglasses.

Dzik then testified to the events surrounding his identification of

Darryl Hedlund, one of the two men allegedly involved in the robbery. Dzik stated he identified Hedlund from several photographs shown to him by the police. Over defense counsel's objection, Dzik also asserted that he later talked with Detective Strain of the Hazel Crest Police Department. After this conversation, Dzik and Strain went to the Mount Prospect police station, where Dzik was shown a composite picture of a man whom Dzik identified as defendant. Dzik testified he recognized the person in the composite sketch because he had seen him on the night of the robbery.

Dzik then examined the photocopy of the composite sketch and testified over objection that it was a composite picture of the person who robbed him and held a gun to his neck on the night of the robbery. Dzik stated he first saw the picture at the Mount Prospect police station. Dzik also described the lineup procedure utilized by the Arlington Heights police on August 8, 1975. He identified defendant after viewing a group of six men. Dzik also identified defendant at the preliminary hearing.

On cross-examination, Dzik asserted he did not turn off the mercury vapor lights in the parking lot of the Ponderosa restaurant on June 10, 1975. Dzik acknowledged that he described his assailant as dark haired, but he also remembered saying that one of the men had blondish-brown hair or medium-brown hair. He also could not remember telling the police that he never saw a gun during the robbery. Dzik asserted he did see a gun for at least 10 seconds.

Dzik further admitted that he saw the eyes of the two men who had robbed him. He also acknowledged testifying at the preliminary hearing and stating that he did not know which of the two men left to get his car keys because he was facing the door and not looking. He also acknowleged testifying at the preliminary hearing that he did not know which of the two individuals had sat on him and held a gun to his neck. Dzik could not remember whether he had informed the police prior to trial or the presiding judge at the preliminary hearing that he had seen the men's reflection in the glass. Dzik indicated that during the preliminary hearing he asserted he had not seen the faces of the men at any time after the incident in the parking lot.

On redirect examination, Dzik again testified that, after viewing the composite sketch, he identified defendant as the man who had robbed him. Dzik also recounted the events surrounding his lineup identification of defendant. He then made an in-court identification of defendant.

The State's next witness, Officer Bruce Strain of the Hazel Crest police station testified he was assigned to investigate the robbery. In connection with that investigation, he contacted a detective at the Elmhurst police station to obtain information about an armed robbery of the Ponderosa Steak House in Elmhurst. He was told to contact the Mount

Prospect police station, which he did. He spoke with a Sergeant Halligan and asked him to forward any photographs of the subjects who may have been involved in that robbery. Subsequently, Strain received a photograph of Darryl Hedlund which Dzik later identified as a photograph of one of the robbers.

Strain again contacted Halligan and requested that he be contacted if there were any other suspects. On July 21, 1975, Strain brought Dzik to the Mount Prospect police station. Halligan gave Strain two photocopies of the composite sketch. After Dzik viewed the photocopy, he identified the person depicted as the second offender. Strain then examined a photocopy of the sketch and identified it as the same copy which was shown to Dzik at the police station.

Strain further stated that Halligan again contacted him on August 8, 1975. Strain then asked Dzik to accompany him to the Arlington Heights Police Department so that Dzik could view a lineup. Strain testified to the events surrounding the lineup and he identified defendant as the man whom Dzik had picked from the lineup of six men. Strain also indicated that defendant's attorney and a public defender were present during the lineup identification.

On cross-examination Strain stated he did not know who composed the composite sketch and he did not see the sketch being composed. Over defense counsel's objection, the sketch was admitted into evidence. Strain then asserted that, although the police report indicated the complaining witness never saw a gun, Strain remembered Dzik telling him that Dzik had observed defendant with a gun as defendant and Hedlund first approached him in the parking lot. At the conclusion of Strain's testimony, the State rested.

The defendant testified in his own behalf. Defendant denied participating in the robbery and asserted that he never weighed more than 135 pounds. Neither he nor Darryl Hedlund had light-colored hair.

Defendant presented an alibi defense. On the night in question, defendant contended he was at home, where he resided with his mother, sister, and two brothers. Defendant claimed he never left his home on the evening of the robbery because he was feeling sick that evening. Defendant further testified that the composite photograph resembled James LaRocco, who had been murdered in a "hold-up" of the Ponderosa Steak House in Elmhurst. Darryl Hedlund had been with LaRocco on the night of that robbery. Defendant described LaRocco's hair as dark brown.

On cross-examination, defendant asserted he had known Darryl Hedlund, "an acquaintance," and James LaRocco for approximately five years. Defendant's sister had informed him that, in 1975, LaRocco had been murdered during a robbery of the Ponderosa Steak House in Elmhurst.

Defendant further asserted he was home sick from June 8 to June 13, 1975. On the day of the robbery, defendant's mother left the home with his brother and sister. They went out to dinner to celebrate his brother's graduation from junior high school. Defendant's younger brother Christopher remained home with him. Between 7:30 p.m. and 10 p.m. defendant watched television. During this time, his brother was not with him. At approximately 10 p.m., his mother, sister, and brother returned home.

Defendant also testified as to the lineup identification procedure. He asserted that someone sitting in the middle of the room pointed to him.

On redirect examination, defendant asserted he was supposed to join his family for the dinner celebration on June 10 and the graduation ceremony the following day but that he was too ill to attend.

Defendant's brothers, sister, and mother also testified. Defendant's brother, Christopher, explained that he (Christopher) was supposed to attend the dinner celebration but that he was too sick to join them. Christopher stayed home with defendant, who also was sick. Christopher watched television in the living room and fell asleep around 8 p.m. Defendant remained in his room.

Defendant's other brother, Todd, testified he graduated from junior high school on June 10, 1975. Todd stated his brother did not attend the celebration dinner because he was sick. When Todd returned home that evening at 10 p.m., Christopher was asleep. Defendant also was asleep in the bedroom which he and Todd shared. Defense counsel then showed Todd the composite sketch. Todd asserted the sketch resembled his sister's old boyfriend, Jimmy LaRocco.

Defendant's sister, Cathy Zimmerman, testified that on June 10, 1975, she, Todd, and her mother went out to dinner to celebrate Todd's graduation. They left home at 7 p.m. When they returned at approximately 10 p.m., Christopher was sleeping on the couch in the living room and defendant was asleep in his room. She further asserted she knew Jimmy LaRocco for five years prior to his death in July 1975. She then examined the composite sketch and stated that it resembled LaRocco. She also testified that LaRocco wore dark glasses "all the time" and he had dark-brown hair. She also described Darryl Hedlund's hair as "light, like my brother's." On cross-examination, she asserted that Jimmy LaRocco was shot to death during a July 1975 robbery of the Ponderosa Steak House in Elmhurst.

Defendant's mother, Evelyn Johnson, also testified that she, Cathy, and Todd celebrated Todd's graduation on June 10, 1975, and went out to a restaurant for dinner. Defendant and Christopher remained home because both boys were sick. When she returned home between 10 p.m. and 10:30 p.m., she saw defendant in his room. Mrs. Johnson further asserted

that the composite photograph resembled Jimmy LaRocco. She also stated that LaRocco always wore dark sunglasses. On cross-examination she asserted that defendant was sick for five days.

In rebuttal, the State called Paul Knott, an attorney present during the lineup identification of defendant. He testified that he did not see anyone sitting in the middle of the room point to the defendant. Dzik identified defendant by walking up to him and placing his hand on defendant's shoulder. The State also called Investigator Larson, who asserted that the defendant's family members had refused to talk to him.

After closing argument, the jury returned a guilty verdict. Thereafter, judgment on the verdict was entered and defendant was sentenced. This appeal followed.

OPINION

I

Defendant first contends[2] that his guilt was not proved beyond a reasonable doubt because Dzik's identification testimony was weak and defendant presented credible evidence of an alibi.

It is well-settled that, where the identity of the accused is at issue, the testimony of a single witness is sufficient to convict, even if the identification testimony is contradicted by the accused, provided that the witness is credible and the accused is viewed under circumstances which would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) The identification does not have to be made under perfect conditions or for a prolonged period of time. *People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599.

Rather, the important factor is whether the witness had an adequate opportunity to view the alleged offender at the time of the occurrence. (*People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235.) Additional factors to be considered in evaluating identification evidence include (1) the witness' degree of attention; (2) the accuracy of the witness' prior description of the criminal; (3) the level of certainty demonstrated by the witness at the time of the confrontation; and (4) the length of time between the crime and the confrontation. *People v. Bell* (1975), 29 Ill. App. 3d 1032, 331 N.E.2d 258; *cf. People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

In the instant case, Dzik viewed defendant under circumstances which permitted him, at a later time, to make a positive identification of

---

[2] No reply brief was filed.

defendant. Dzik testified that several lighted mercury-vapor lights illuminated the parking lot where Dzik first observed the two offenders. Dzik also observed defendant walking towards him for approximately one minute. As defendant walked towards him, Dzik viewed defendant first from a distance of 15 feet and, finally, from two or three feet. Dzik also saw defendant's reflection in the side door of the restaurant.

Further, Dzik's detailed description of events indicates he was closely attentive to the enactment of the crime. The fact that he observed two men, one of them armed with a gun, approach him supports the inference that Dzik was fearfully watching them and "viewed [the scene] with the close attention accorded unusual occurrences." (*People v. McTush* (1980), 81 Ill. 2d 513, 522, 410 N.E.2d 861, 866.) Dzik also consistently and positively identified defendant; first from a composite sketch, second from a lineup of six men, and finally at the preliminary hearing and trial. The length of time between the crime and the lineup confrontation, two months, was not unduly long so as to mar the strength of the identification. (See *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.) The fact that defendant wore sunglasses at the time of the offense does not render uncertain Dzik's subsequent identification of defendant. See, *e.g.,* *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

While it is true, as defendant contends, that alibi evidence must not be disregarded where the only evidence contradicting it rests upon the identification of defendant, the principle is inapplicable here, where the entire record reveals no reasonable doubt of guilt due to an uncertain identification. (*People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688.) It is well settled that the trier of fact is not required to accept alibi testimony over the positive identification of a defendant, even if the alibi testimony is presented through a greater number of witnesses. *People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168.

■█ In the instant case, defendant's alibi testimony created an issue of fact for the jury to resolve. (See *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) Defendant's sister and brothers testified he was home at 10 p.m. on the night of the incident. Defendant's mother testified she saw him at home at 10:30 p.m. on the night in question. In resolving the issues of fact and determining the witnesses' credibility, the jury could have considered the possible bias or interest of these witnesses. (*People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688.) The jury was not required to believe their testimony. (See *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.) The jury, unlike this reviewing court, heard the evidence presented and observed the demeanor of the witnesses. The jury was entitled to believe Dzik's identification testimony, and we find no reason to reverse their determination of guilt.

## II

Defendant next contends reversible error occurred when the trial court, over defense objection, allowed a composite sketch of unknown origin to be admitted into evidence. Defendant asserts the sketch constitutes inadmissible hearsay.

In *People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223, our supreme court stated that evidence of a prior identification of defendant is admissible "[w]here the declarant is available for cross-examination and the evidence satisfies constitutional and other evidentiary requirements." (81 Ill. 2d 571, 582, 411 N.E.2d 223, 229.) Rejecting defendant's hearsay argument, the court held that a composite sketch and the complaining witness' description of defendant were properly admitted into evidence as corroboration of the witness' in-court identification. The supreme court reasoned that since the identifying witness testified under oath and was subject to cross-examination as to his out-of-court statements, defendant had an opportunity to ascertain the veracity of the testimony.

■■ As in *Rogers*, Dzik, the identifying witness, testified under oath and was subjected to cross-examination as to his out-of-court statements. Under these circumstances, according to *Rogers*, the admission of the composite sketch as corroborative evidence was not error because the identification testimony did not constitute impermissible hearsay evidence. (81 Ill. 2d 571, 580-81, 411 N.E.2d 223.) Thus, we are compelled to reject defendant's hearsay argument.

Defendant also argues that the composite sketch was erroneously admitted into evidence because the State did not elicit any foundational testimony. At trial, Dzik asserted he viewed a photocopy of a composite sketch of a male and then identified this male as one of the two men who had robbed the restaurant. Dzik examined a photocopy of the sketch which had been marked for identification, and he testified that it was the same copy he had viewed at the police station. Dzik did not know who had prepared the sketch. Officer Strain testified he received the sketch from the Arlington Heights police after he had requested photographs of possible suspects. He also was unaware of the origins of the sketch.

■■ In *Rogers*, the supreme court noted that prior identification evidence must satisfy constitutional and evidentiary requirements. Thus, the sketch must have been authenticated prior to its admission into evidence. As in *United States v. Moskowitz* (2d Cir. 1978), 581 F.2d 14, 21, *cert. denied* (1978), 439 U.S. 871, 58 L. Ed. 2d 184, 99 S. Ct. 204, a case cited with approval in *Rogers*, the sketch here "was authenticated by extensive testimony that the sketch introduced at trial was the same sketch identified by the witness." The court reasoned that the testimony of the artist was no more necessary as a condition of admissibility than a photographer's

testimony would have been had the witness identified a photograph. We agree. In our view, the composite sketch in the case at bar was properly authenticated and admitted into evidence.

In any event, the testimony of Dzik that he had previously said the sketch looked like one of the robbers and the admission of the composite sketch were not prejudicial. All of defendant's alibi witnesses and defendant himself testified that the sketch resembled Jimmy LaRocco, not the defendant. Thus, defendant used the sketch to persuade the jury that Jimmy LaRocco was actually the one who participated in the robbery in question. Under these circumstances, we do not believe any prejudice resulted to defendant (*cf. People v. Pickens* (1978), 63 Ill. App. 3d 857, 380 N.E.2d 868) and the admission of the sketch, if error, was harmless.

### III

Defendant next contends he was denied his sixth amendment right to cross-examination when Officer Strain testified as to the procedure utilized in obtaining the composite sketch. Defendant asserts this testimony constituted inadmissible hearsay in the form of assertive conduct.

At trial, Strain testified that he contacted the Elmhurst Police Department and someone there referred him to the Mount Prospect Police Department. Strain then contacted Officer Halligan and requested that he forward any information or photographs of the subjects involved in a robbery of a Mount Prospect Ponderosa restaurant. Strain stated that he then received a photograph of Darryl Hedlund. Defendant argues that the testimony is assertive conduct since Strain's receipt of the photograph indicates that Halligan believed Hedlund was a subject involved in the robbery and Halligan was not subject to cross-examination about this conclusion.

Defendant also maintains that the following testimony constituted inadmissible hearsay in the form of assertive conduct. Strain testified he told Halligan he wanted to bring Dzik to Mount Prospect if there were any other suspects. On July 21, 1975, Strain had a conversation with Halligan and then brought Dzik to the Mount Prospect police station. There, Halligan gave Strain two copies of a composite sketch. Strain showed Dzik one of these copies, and Dzik said the sketch resembled the robber. Strain then stated that he and Dzik returned to Hazel Crest and Strain waited for further information from Halligan as to where the subject could be located. Halligan contacted Strain on August 8, 1975. Strain then called Dzik and told him he could view a lineup in Arlington Heights. Defendant contends that Halligan's call to Strain on August 8, 1975, amounted to an assertion by Halligan that the person in the sketch

was in custody and was a "further suspect." Defendant asserts this testimony was hearsay since he did not have an opportunity to cross-examine Halligan about his conclusions.

Defendant argues that his identification came about solely as a result of Halligan's purported knowledge about who the perpetrators of the offense were. Halligan provided photographs of Hedlund and a composite of the "other suspect" and finally concluded that defendant was the person in the composite.

The State maintains that Strain's testimony was properly admitted as reflecting an investigatory procedure which was entirely within the officer's personal knowledge. Strain did not testify to what Halligan said but only to what Strain himself said and did. The State contends that Halligan was not an occurrence witness who could have identified defendant at trial. We agree. Strain did not testify that Halligan named defendant or indicated that defendant resembled the person depicted in the sketch.

In our view, Strain's testimony reflected an investigatory procedure that was entirely within his knowledge and therefore was not inadmissible hearsay evidence. (*People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.) Informing the trier of fact on consequential steps in an investigation of a crime is normal procedure and is important to the full presentation of the State's case. The State must be permitted to make some explanation why or how a previously unidentified defendant came to be charged with the crime. (*People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) In any event, we do not believe that the admission of Strain's testimony was prejudicial error requiring reversal. Since Dzik positively and consistently identified defendant as one of his assailants, we are unable to determine how Strain's testimony resulted in any prejudice to defendant. See *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

Accordingly, for the reasons noted, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.