THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
AUGUSTIN R. REYES, Defendant-Appellant.

First District (2nd Division)   No. 80—2166

Opinion filed August 31, 1982.

James J. Doherty, Public Defender, of Chicago (Barbara Anne Steinberg and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joan S. Cherry, and Barbara Levin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:
Defendant, Augustin Reyes, was charged in an information with

murder and armed violence. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 33A—2.) In a jury trial defendant was found guilty of both offenses. The court entered judgment on the verdicts and sentenced defendant to serve 30 years in the Illinois Department of Corrections on the murder conviction. No sentence was imposed on the armed violence judgment.

On appeal defendant contends: (1) that the trial court erred in determining that there was an independent basis for the in-court identifications of defendant by two eyewitnesses; (2) that defendant was not proved guilty beyond a reasonable doubt; (3) that the trial court erred in refusing to allow the jurors to visit the scene of the crime and in permitting the testimony of five State witnesses to be read to the jury; and (4) that the cause must be remanded for resentencing on the murder conviction because the trial court improperly entered judgment on the armed violence conviction.

For the reasons hereinafter stated, we affirm the conviction and sentence for murder and vacate the armed violence judgment.

Two of the State's eyewitnesses, Deborah Udchik and Pamela Jones, viewed defendant at separate times in two lineups. Neither witness identified defendant in the first lineup, and both identified him in the second. Defendant was the only person who appeared in both lineups. Prior to trial defendant moved to suppress Deborah's and Pamela's identifications of defendant in the second lineup and their in-court identifications at trial.

At the suppression hearing, Deborah testified that at 9 p.m. on June 20, 1979, she and her boyfriend, Lozarro Torres, were conversing while leaning against a car parked on the east side of St. Louis near Wrightwood in Chicago. It was dark outside, and the closest street light was 200 feet away near an alley. Deborah first saw the defendant, whom she did not know, at a distance of 30 feet. Deborah and her boyfriend stopped talking as defendant walked towards them. At a distance of 15 feet, defendant said, "O.A. Love," and continued to approach them. Deborah looked at defendant as he walked towards them. When the man was within five feet of Deborah and Torres, he stopped, asked Torres, "Who are you?" and when Torres said, "No!", shot Torres once, then turned and fled from the scene.

Deborah estimated that "about a minute, a minute and a half" elapsed from the time she first saw defendant on the street until he ran after the shooting, and that 30 seconds passed from the moment he said "O.A. Love" until he shot Torres. During that 30-second interval, Deborah looked at and was able to see defendant's face. She described the assailant as five feet six inches tall, 140 pounds, and 17 or

18 years old. He seemed shorter than Deborah (who was five feet eight inches tall at the time), but she was not certain whether he was shorter or taller than she because she was leaning against a car. When asked if the man had any distinguishing marks on his body or face, she answered, "I don't know. I don't remember. I don't think so. I am not sure." When asked whether defendant wore glasses, or had a moustache or a beard, Deborah said, "I think he had a moustache." The defendant was wearing light blue "baggies" and a light colored "gauze-like" shirt with the sleeves rolled up.

Deborah testified that she spoke with the police at the scene immediately after the shooting and gave them a description of the assailant that was similar to the one she related at the suppression hearing. The court sustained the State's objection to defense counsel's question regarding whether Deborah had ever told the police that the shooter had a "black afro." Later in the hearing, she said that she did not know what an afro is. At trial, however, she denied that she had ever told the police that the offender had a black afro. That testimony was corroborated by Officer Sesso's statement that Deborah had told him that the offender's hair was combed back.

Pamela Jones, who was 16 at the time of the shooting, testified that at about 9 p.m. on June 20, 1979, she was riding her bike north on St. Louis towards Diversey when she passed the defendant who was walking south. After she passed defendant, she turned her bicycle around and followed defendant as he continued down the street. Pamela passed defendant again when he stopped on the corner of Drummond (which is 2634 North) and St. Louis. Pamela rode towards Wrightwood (2600 North), then went back to her home at 2625 North St. Louis. She put her bike in front of her house and walked to the curb. Pamela saw defendant "talking to two guys on the corner" of Drummond and St. Louis. Defendant then walked south on the sidewalk on the east side of St. Louis. Defendant passed directly in front of Pamela at a distance of five feet. It was dark and Pamela thought that a street light across the alley from St. Louis and Wrightwood was broken, but there were other street lights and she could still see. Pamela testified that she saw defendant's whole face and watched him for a minute as he walked past the front of her home.

After the defendant passed Pamela, she saw Lozarro Torres talking with his girlfriend Deborah Udchik near the corner of St. Louis and Wrightwood. About a minute and a half after defendant walked by, Pamela heard a gunshot and saw defendant standing at that corner. Defendant's back was towards her. Defendant ran east through an alley that was 15 to 20 feet from her home.

Pamela described the shooter as a dark-skinned, medium build Latin "not much taller" than she (Pamela was five feet four inches tall at the time) with short, dark brown or black hair that was "feathered" back and a "light" moustache. She could not remember the clothes defendant was wearing or what she had told the police about his clothes.

Both Deborah Udchik and Pamela Jones viewed a lineup a few hours after the shooting. They viewed the lineup separately. It was held in a large open room where the persons being viewed could see the witness who was viewing them. Deborah recognized defendant but did not tell the police because she was scared. Pamela told the police that she was not sure that she could identify anyone. Investigator James Lanners conducted the first lineup. He testified that Deborah and Pamela viewed the lineup separately. He told them that if they saw the person who had shot Lozarro they should tell him the number above that person's head. They did not have to point at the person or say anything out loud. Lanners stated that Deborah did not identify anyone, and Pamela, referring to the defendant's number, said, "I think that's him, but I'm not sure." According to Lanners, Pamela said she was scared or nervous and indicated that something was bothering her. Lanners admitted that in his written report he stated that both witnesses were unable to make an identification because they were nervous.

On the afternoon of June 21, 1979, Deborah and Pamela viewed a second lineup consisting of defendant and four other men. Defendant was the only man who appeared in both lineups. The lineup was conducted in a small office, and both Deborah and Pamela, who viewed the lineup separately, were able to see the men in the lineup through a peephole in a door. The men in the lineup could not see the witnesses. In the first lineup none of the men was asked to step forward or say anything. In the second lineup each man was asked to step forward and say the words, "O.A. Love." Both witnesses identified defendant. Pamela also testified that she recognized his voice because she had heard him say "O.A. Love" the night before.

Deborah testified that the assailant had combed-back short dark brown hair that just covered part of his ears. She admitted that a photograph of the persons standing in profile at the second lineup showed that defendant had considerably longer hair.

Investigator Neil Sullivan explained the procedures followed in the second lineup. Sullivan stated that defendant was five feet nine inches tall at the time of that lineup.

The trial court granted defendant's motion to suppress the lineup

identifications of defendant by Deborah Udchik and Pamela Jones but ruled that there was an independent basis for an in-court identification by both witnesses.

The testimony of Deborah Udchik and Pamela Jones at trial was substantially similar to their testimony on the motion to suppress. Both witnesses identified defendant as the man who shot and killed Lozarro Torres.

Deborah testified that she recognized defendant at the first lineup but did not tell the police because she was scared and wanted to go home. She realized that by not identifying the shooter at that time, Lozarro's killer would "go back out into the street." Deborah stated that the offender was five feet six inches tall and that she was five feet eight inches tall. At trial Deborah said that the offender had a light moustache. She admitted that when a defense investigator asked her in a pretrial interview whether the shooter had any facial hair like a beard or moustache, she said, "*** I don't really know. I don't think so." According to Investigator Guthrie, defendant had a moustache when he appeared at the police station on the night of the shooting.

Deborah testified further that she was close enough to see and notice anything unusual about the assailant and saw his lips form the words "O.A. Love," but did not see braces on his teeth.

Pamela Jones testified that she saw defendant talking to George Nieves and Jimmy Rodriguez on the sidewalk near Drummond and St. Louis. When she first noticed him walking south on St. Louis, defendant was not doing anything unusual. Pamela stated that she thought defendant was a couple inches taller than she. (She was five feet four inches tall at the time.) She also testified that she had seen the right side of his face and his back. Pamela admitted that she told a defense investigator in January 1980 that she had forgotten what the man looked like.

At trial the State introduced evidence from a third eyewitness, Jimmy Rodriguez. Rodriguez testified that he was standing on the corner of Drummond and St. Louis with his friend George Nieves when defendant walked up and started talking to them. Defendant asked if there were any Gaylords around. Rodriguez said nothing and Nieves said that he did not know. Patting himself on the hip, defendant said, "I'm packing," and asked Rodriguez and Nieves if they would like to see him kill a Gaylord. Rodriguez said that defendant talked with Nieves and him for just under two minutes. He then watched defendant walk south on St. Louis about three-fourths of a block to an alley. When defendant got to the alley, Rodriguez heard

him say, "O-A Live" or something similar. He thought that defendant also said, "Gaylords die." Defendant's voice was muffled. Rodriguez then heard a loud noise and saw a flash.

Rodriguez identified defendant in court and in a lineup held on June 21, 1979. Investigator Guthrie corroborated the lineup identification. Since Rodriguez did not view the first lineup, his out-of-court identification of defendant was not challenged by defendant in his pretrial motion to suppress.

On cross-examination Rodriguez testified that he did not pay any attention to the defendant's clothes but said his eyes were "bulgy" and that his hair was black and tossed back. Rodriguez admitted that he told an investigator that the defendant was five feet four inches tall. Although defendant talked in a normal fashion and was close enough for Rodriguez to see his mouth, Rodriguez saw no braces on defendant's teeth nor did he remember seeing a moustache.

Investigator Guthrie testified that the scene of the shooting was a neutral area between two rival street gangs, the L. A. Gaylords and the Orquestra Albany (O.A.) gang.

Investigator Sesso testified that the street light nearest the scene of the shooting was not working, and the closest functioning street light was at St. Louis and Wrightwood, a quarter block away.

The parties stipulated that Torres died of a single gunshot wound to the heart and left lung.

The defense called one witness, defendant's father, Juan Reyes. Reyes testified that in June of 1979 his son wore a moustache and had a full set of braces on his upper and lower teeth. He also testified that three or four years earlier his son had told him he belonged to a street gang for self-preservation. Reyes told an assistant State's Attorney that the gang his son had been associated with was known by the symbol "O-A." On redirect, Reyes said that his son had never told him the name of the gang to which he belonged. Reyes heard the name at the police station on June 21, 1979.

Defendant was found guilty of murder and armed violence.

I

Defendant's first argument is that the trial court erred in finding that there was an independent basis for Deborah Udchik's and Pamela Jones' in-court identifications of defendant sufficient to outweigh the influence of an impermissibly suggestive lineup.

Where an out-of-court identification has been found to be unnecessarily suggestive and inadmissible, the State must prove by clear and convincing evidence that the in-court identification had an indepen-

dent origin arising from other uninfluenced observations of the defendant. (*People v. Scott* (1980), 92 Ill. App. 3d 106, 415 N.E.2d 1082.) The determinative factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated at the confrontation and the length of time between the crime and the confrontation." (*Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) In *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861, the supreme court noted that whether the witness has any acquaintance with the suspect prior to the crime may be considered an additional factor. Since neither Deborah nor Pamela knew defendant before the crime, this factor is not present.

Deborah Udchik estimated that she saw defendant for "about a minute, a minute and a half." Thirty seconds passed from the moment defendant said "O.A. Love" until he shot Torres. Defendant was only five feet from her at the time. Pamela saw defendant first as she passed him on her bicycle. She saw him again as he walked by her home. Pamela estimated that she watched him for a minute as he passed her home. He came within five feet of her. Both times she had an opportunity to see his face. The time the witnesses had in this case to view defendant at close range was sufficient to make an identification. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Johnson* (1980), 94 Ill. App. 3d 200, 418 N.E.2d 768.

From the record it appears that Pamela noticed nothing unusual about defendant and did not pay much attention to him. She did testify, however, that she watched him as he walked past her home. And Deborah concentrated on defendant during the 30-second interval between defendant's comment and the shooting. We believe that the first two factors of the *Biggers* test were satisfied. Although defendant stresses that it was night and a street light was out, both witnesses testified that they were able to see defendant's face. Officer Sesso testified that there were "numerous" lights in the area and that the location of the shooting was no darker than the rest of the street because illumination from the nearby intersection created a "corridor of light all the way up to the alley." Moreover, Pamela saw defendant at different locations on the street.

The third *Biggers* factor is the accuracy of the witness' prior description. Both witnesses gave detailed descriptions of defendant. Defendant, however, points to the discrepancies in the witnesses' estimation of defendant's height. Defendant was five feet nine inches tall

and the witnesses gave estimates that varied from defendant's actual height by a few inches. Defendant also stresses that Pamela failed. to mention defendant's braces or moustache. Pamela, however, never saw defendant speak so she would have had no opportunity to see his braces. Several witnesses characterized defendant's moustache as "slight" or "light." Deborah did testify that she thought defendant had a moustache. While she did not see defendant's braces, braces are not necessarily observable when someone is talking. It must also be noted that Deborah heard and saw defendant speak only six words, "O.A. Love" and "Who are you." The first three words were spoken at a distance of 15 feet. The last three were spoken at a distance of five feet. Only the word "are" in the question "Who are you?" would normally be said in such a manner so as to reveal the presence of braces.

The discrepancies in the witnesses' descriptions of defendant are not significant. As in *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 616—17, 378 N.E.2d 1318, "any discrepancies or inaccuracies or omissions as to facial hair *** or some other facial characteristic *** or some other physical characteristic such as height or weight *** are not fatal *** but simply go to the weight of the identification testimony and are to be evaluated by the trier of fact."

The last two factors enunciated in *Biggers* are the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation. Here, the first lineup was held a few hours after the crime. Deborah testified that she recognized defendant at the first lineup but did not tell the police only because she was scared. Pamela told the police at the first lineup that she thought defendant was the offender but was hesitant to make a positive identification because she also was afraid. This was corroborated by the investigators who conducted the lineup. Investigator Lanners stated that Pamela pointed out defendant but then backed down because she was scared or nervous. Investigator Sesso testified that Deborah broke down when the suspects faced her and ran from the room. He was unable to get her to return to the room to view the lineup. When he brought Pamela in to view the lineup, she "jumped back," crying, "I can't look, I don't want to look" and left the room.

■ It is apparent that there is a distinction to be made between a witness' failure to identify an offender because of uncertainty and failure to identify because of fear. That Deborah Udchik and Pamela Jones did not identify defendant at the first lineup does not cast doubt on their ability to identify defendant at the time of the crime or

in court. On the basis of the record before us, we cannot say that the trial court's determination that there was an independent basis for the witnesses' in-court identifications was erroneous.

## II

Defendant next argues that he was not proved guilty beyond a reasonable doubt. A major portion of this argument is based on defendant's initial argument. Since that has been resolved adversely to defendant, it will not be restated here.

In the present case, there were three eyewitnesses to the shooting. One witness, Deborah Udchik, was able to view defendant for 30 seconds at a distance of from five to 15 feet as he approached her boyfriend and methodically killed him. A second witness, Pamela Jones, saw defendant while she was riding her bicycle, as he walked past her home and again when he fled in an alley after shooting Torres whom Pamela had seen with Deborah. A third witness, Jimmy Rodriguez, testified that defendant approached him, indicated he had a weapon and said he was looking for some Gaylords. Defendant asked Rodriguez and his friend if they wanted to see him kill a Gaylord. Defendant then proceeded down the street and shot Torres. Rodriguez saw a flash and heard the noise of a gunshot. He also heard defendant say, "O-A Live" or similar words. In addition, there was testimony that defendant had belonged to a rival street gang.

In our judgment defendant was proved guilty beyond a reasonable doubt of murder.

## III

■ Defendant's third argument consists of two subarguments. First, defendant argues that the trial court erred in refusing the jury's request, made after deliberations began, to visit the scene of the crime. Defendant, however, did not object to the court's refusal to allow the jury's request, nor did he raise it in his post-trial motion for a new trial. Hence, that issue has been waived.

Defendant next argues that the trial court erred in acceding to the jury's request to have the court read to it transcripts of the testimony of five State witnesses. At one point in its deliberations the jury requested the court to provide transcripts of the testimony of Deborah Udchik, Pamela Jones, Jimmy Rodriguez and "the police officers." The court responded that transcripts were not available. Later the jury advised the court that no verdict had been reached but one could be reached if the jury could have the transcripts. The next day a second note was handed to the court which read, "The jury feels

that its deliberations can only go forward from this point if it is able to examine the testimony of Deborah Udchik, Pamela Jones, Jimmy Rodriguez, Officer Sesso, Officer Guthrie." Over the objections of both parties the court allowed the jury's request and had the testimony of the five witnesses read to the jury after which the jury continued deliberations and found the defendant guilty of murder and armed violence.

Defendant argues that the court abused its discretion in allowing a "retrial of the State's case against the defendant." Although defendant cites authorities indicating that a *refusal* to read an entire transcript of testimony or a substantial portion thereof is not an abuse of discretion, that does not mean that the *granting* of such a request is an abuse of discretion, particularly where the jury indicates that a verdict cannot be reached without it. (See *People v. McClellan* (1979), 71 Ill. App. 3d 611, 617, 390 N.E.2d 131.) Here, the court polled the jury, and each juror expressed his or her concurrence with the will of the jury as a whole. To avoid the possibility of misleading the jury, the court read virtually the entire testimony of every witness whose testimony the jury requested. As a result, the "jury could fairly compare all portions of his testimony." *People v. McClellan* (1979), 71 Ill. App. 3d 611, 617.

Defendant's complaint that the reading of the transcripts was prejudicial because it amounted to a "retrial of the State's case against the defendant" overlooks the fact that with the exception of one witness, all the witnesses at trial were called by the State. This is not an instance where the testimony of the State's witnesses was unfairly pitted against that of the defendant whose witnesses' testimony was not read. The issue in this case was identification. Defendant's sole witness, his father, shed no light on the circumstances of the crime or the whereabouts of his son at the time it was committed. His testimony was introduced principally for the purpose of establishing that at the time of the crime his son had a full set of upper and lower braces on his teeth and wore a moustache. These facts were also brought out on examination of the State's witnesses and thus there was no slighting of defendant's defense.

Neither the number of witnesses nor the extent of the testimony read in this case indicates an abuse of discretion. Indeed, in *People v. Smith* (1979), 76 Ill. App. 3d 191, 198, 392 N.E.2d 682, the court suggested that a review of the transcripts of testimony of six witnesses would have been proper.

■ The decision to allow or to refuse a jury's request for a review of testimony lies within the discretion of the trial court, and that

decision will not be disturbed absent an abuse of discretion. (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577.) No abuse of discretion has been shown in the present case.

## IV

The final issue raised initially by the State's answer brief is the propriety of the judgment of conviction for armed violence on which no sentence was imposed. The State asks the court to remand for sentencing under the authority of *People v. Pearson* (1981), 102 Ill. App. 3d 732, 430 N.E.2d 304. Defendant, however, relying on the recently decided case of *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, argues that the armed violence judgment must be vacated. In our opinion defendant's argument is well taken.

In *Donaldson* the supreme court held that "multiple convictions for both armed violence and the underlying felony cannot stand where a single physical act is the basis for both charges. *** Judgment should have been entered and sentence imposed only on the more serious offense." (91 Ill. 2d 164, 170.)[1] Here, the more serious offense is murder. The armed violence judgment, therefore, must be vacated. Remandment for resentencing on the murder judgment is unnecessary since the trial court did not impose a single sentence for both offenses. 91 Ill. 2d 164, 170-71.

For the foregoing reasons the murder judgment is affirmed and the armed violence judgment is vacated.

Affirmed in part; vacated in part.

DOWNING and HARTMAN, JJ., concur.

---

[1]We note that pursuant to *Donaldson*, the supreme court vacated the defendant's conviction for the offense of armed violence in *People v. Pearson*, cited by the State. See order accompanying denial of the petition for leave to appeal in *People v. Pearson* (1981), 102 Ill. App. 3d 732, *appeal denied* (1982), 91 Ill. 2d 564.