THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLAYTON ROCKMAN, Defendant-Appellant.
First District (1st Division)   No. 83—1880

Opinion filed May 27, 1986.

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:
Following a jury trial, defendant, Clayton Rockman, was found guilty of the murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) of Alfonso Ayala and sentenced to an extended term of 75 years in the Illinois Department of Corrections. On appeal, defendant contends that: (1) the trial court improperly denied: (a) his motion to suppress the anticipated eyewitness in-court identification; (b) his motion for a continuance; and (c) his hearsay objections to admission into evidence of the license plates and temporary registration application registered to defendant and taken from the alleged getaway car; (2) the trial court erred when it admitted testimony as to defendant's presence in California at the time of his arrest; (3) the trial court prejudiced defendant by allowing a portion of the transcript to be amended; (4) defendant was denied effective assistance of counsel; and (5) the State's comments during closing and rebuttal arguments denied defendant his right to a fair trial. For the reasons that follow, we affirm the judgment of the trial court.

The record presents the following facts pertinent to this appeal. On the afternoon of January 25, 1981, Super Bowl Sunday, Alfonso Ayala was shot and killed in Bonnie's Tavern, located at 27th and Karlov in Chicago. Based upon a photo identification by Gustavo Medrano and Juan Saucedo as well as the identification and location of the automobile seen speeding away from the tavern, defendant was arrested for Ayala's murder.

Prior to trial, defendant moved to suppress both Medrano's lineup and anticipated in-court identifications of defendant. With respect to the lineup identification, defendant argued that: (1) he was denied his right to have counsel present during the lineup; (2) Medrano's identification was improperly induced by a detective; and (3) the lineup was held in contravention of a court order that stated the lineup was not to be conducted until defendant had been presented in open court and tendered a copy of the written charges against him. Following testimony in support of defendant's allegations with no contrary evidence presented by the State, the trial court granted defendant's motion to

suppress the lineup identification.

Once the lineup identification was suppressed, defendant argued that the lineup identification irreparably tainted Medrano's anticipated in-court identification and, thus, the latter should not be allowed. In response, the State claimed that there was an independent basis for Medrano's in-court identification. In this regard, Medrano testified that on January 25, 1981, approximately 1:15 p.m., he went to Bonnie's Tavern to watch the Super Bowl football game. Alfonso Ayala, two other patrons and the bartender were also present. Approximately 2:30 p.m., two black men, one of whom Medrano identified as defendant, entered the tavern. Defendant entered through the side door and the other man entered through the front door. Initially, defendant asked directions to the washroom, then he and the other man pulled out guns and began shooting in the direction of the bar.

When the shooting started, Medrano dove under the pool table which was located several feet behind where he had been sitting and positioned himself so that he was facing Ayala who was then lying on the floor, wounded, next to the pool table. While in that position, Medrano saw defendant walk up to Ayala and start shooting at him from close range. Medrano stated that the lighting in the tavern was very good because nearly one entire wall was built of glass blocks through which the sun was shining. In addition, there was artificial lighting in the tavern.

Medrano further stated that approximately one month after the shooting, the police showed him a group of photographs from which he identified a photograph of defendant as the man who had shot Ayala. Following arguments on the motion to suppress the anticipated in-court identification, the trial court denied the motion on the ground that it was adequately based on Medrano's independent ability and opportunity to see defendant at the time of the shooting.

Thereafter, defendant moved *in limine* to bar any testimony with respect to defendant's extradition from California on the ground that the prejudice to him as a result of the suggestion of flight would outweigh any probative value. The court denied the motion with respect to testimony that defendant was in California at the time he was arrested, but allowed the motion with respect to the term "extradition" and the facts of any legal proceedings necessary to transfer defendant from California to Illinois.

At trial, Medrano testified to essentially the same occurrence facts that he had stated at the pretrial motion hearing and identified defendant as the man who had shot Ayala. Furthermore, Medrano added that after defendant and his companion had left through the

side door of the tavern, he went to the side door and saw a white car with a dark red top speed away. Approximately one month later, the police showed Medrano a group of photographs from which he identified a photograph of defendant, and stated to the police officer that he wanted to see that man. Within the same time period, the police also took Medrano to the police auto pound where he identified the car he had seen speeding away from the tavern.

Juan Saucedo testified that he lived approximately three doors south of Bonnie's Tavern. Approximately 10:30 a.m. on the morning of the shooting, Saucedo left his home to buy a newspaper. While walking south on Karlov toward 27th, he noticed two black men walking behind him. The men were particularly noticeable because the neighborhood was predominantly white and hispanic. When Saucedo returned to his home after buying the paper, he turned around and saw the two men standing at the corner diagonal from the tavern. He dropped the paper at home and went back outside to see if the men were still there. On his way toward the tavern, Saucedo saw the two men standing near the tavern's side door. A few minutes later, while walking back toward his house, Saucedo saw one of the men standing by himself near the tavern. Saucedo identified defendant as the man he had seen. When Saucedo approached defendant and asked him what he was doing there, defendant said that he was waiting for a friend. As the second man approached them, one of Saucedo's neighbors walked up to Saucedo and asked him what was happening. While Saucedo and his neighbor were talking, the other two men walked away, got into a white Pontiac with a dark red top, and drove away.

Later that afternoon when Saucedo returned home from shopping, he saw police cars and a paddy wagon in front of the tavern. Approximately one month later, the police drove Saucedo and Medrano to the police auto pound where Saucedo identified the car in which he had seen defendant and his companion drive away. After identifying the same car identified by Medrano, Saucedo was taken to the police station where he viewed a photo array from which he identified defendant as the man with whom he spoke outside the tavern.

Edward Stringer then testified that approximately 2:30 p.m. on January 25, 1981, he was shoveling snow in front of his house one-half block west of Bonnie's Tavern when he heard gunshots coming from the direction of the tavern. He then saw two black men run out of the tavern's side door and get into a white car with a purple or dark red top. As the car drove down the street toward Stringer, he saw the front license plate number. He immediately ran upstairs and wrote the license plate number on his hand. When the police arrived

approximately five minutes later, Stringer gave them the license plate number.

Detective Thomas McCarthy of the Chicago police department testified that he had been given information that the car used to flee the scene of Ayala's murder was an older model, white full-sized car with the license plate number "OZ 6001," "OZ 6110," or "CZ 6001." On February 23, 1981, McCarthy located a white 1973 Pontiac with a red top and license plate number "OZ 6001," parked, unoccupied in a parking lot. A license plate check revealed that the plates were registered to defendant for a different car. While he was watching the car, McCarthy observed two individuals, later identified as Willie Porch and Marve Turner, enter the car and drive away. McCarthy stopped the car, removed the license plates and an Illinois registration transfer application from the windshield and drove the car to police headquarters from where it was towed to the police auto pound.

Subsequently, McCarthy drove Medrano and Saucedo to the police auto pound and asked each one, individually, to walk around the pound and see if they could locate a car that looked like the one that they had seen speeding away from Bonnie's Tavern. Medrano located the car within 10 minutes. Saucedo also picked out the same car. McCarthy then drove Medrano and Saucedo to police headquarters where they individually viewed a photo array. Each witness picked out defendant's photo.

Detective Robert Dodson of the St. Louis metropolitan police department testified that in May 1981, he was aiding the Chicago police department in their search for defendant based upon information received by the Chicago police that defendant had been seen driving a Cadillac Fleetwood with Missouri license plates "AMP 245." On May 10, 1981, based on the information received from the Chicago police, Dodson conducted a stake out at a Missouri Travelodge Motel, outside of which a car fitting the description was parked. Dodson had a photograph of defendant with him. Approximately 1:30 a.m., Dodson entered the suspect's motel room and found a woman who identified herself as Betty Gibson. Following a search of the room, Dodson recovered several credit cards, a loaded .357 revolver, and a photograph of defendant with a woman and a child. Dodson thought the woman in the photograph was Betty Gibson. Later that day, Dodson stopped a maroon 4-door Cadillac which pulled up to the Travelodge. The driver identified himself as Marcus Young, to whom the car was registered. Dodson stated that Young bore a physical resemblance to defendant.

Betty Gibson was charged with possession of a weapon and possession of stolen property.

At this point in the testimony, defense counsel requested a side bar, stating that he had information that a photograph had been taken of Betty Gibson by the St. Louis police which the defense needed in order to prove that the woman in the motel room photograph was Viola Harmon, defendant's common law wife, not Betty Gibson as testified by Officer Dodson. Defense counsel further stated that he also wanted to present Viola Harmon to Dodson and ask him if that was the woman he had arrested in St. Louis. Although the State agreed to defendant's request to present Harmon who was outside of the courtroom, defense counsel never did so. Instead, he asked for a continuance to obtain a copy of the photo allegedly taken of Betty Gibson by the St. Louis police. The State argued that it never had the arrest photo and that defendant had never requested it. In fact, there is no evidence that such a photo was ever taken. The court then ordered the State to commence redirect and granted leave for defendant to reopen cross-examination of Officer Dodson with respect to the alleged misidentification of the woman in the photograph at a later time.

When the State rested its case, defendant again requested a continuance so that he could send his investigator to St. Louis to pick up the arrest photograph allegedly taken of Betty Gibson for purposes of impeaching the testimony of Officer Dodson. The trial court found that the issue of the identity of the woman in the photograph was a collateral issue and irrelevant. Further, the court found that the importance of the photograph found in the motel room was that it was a photo of defendant and that it was found in the same room in which the .357 revolver was found, both of which were undisputed facts. Thereafter, defendant's motion for a continuance and a directed verdict were denied.

Subsequently, the State moved to amend a portion of the transcript of Medrano's testimony to strike the word "can't" in the sentence, "I can't see the man's face" and insert the word "can," so as to comport with the balance of Medrano's testimony. In response, defendant argued that the proper way to make such an amendment would be either for the court reporter to take the stand and testify as to what she had heard or by means of an affidavit. The court granted the motion to amend on the ground that the court recalled Medrano saying "can" and that the amendment comported with the balance of Medrano's testimony, the essence of which was to identify defendant as the man who had murdered Ayala.

Next, Viola Harmon, defendant's common law wife, testified that she was not in St. Louis in May 1981; has never stayed at the St.

Louis Travelodge Motel; and the photo taken from the motel was a picture of her and defendant, not a picture of Betty Gibson and defendant.

Following closing arguments, the jury found defendant guilty of murder and judgment was entered on the verdict. Prior to sentencing, defendant moved for a new trial, alleging that the trial court erred in denying him a continuance to obtain the photo of Betty Gibson and in allowing the State to amend the transcript. Following the trial court's denial of the motion, defense counsel added *instanter* an additional allegation to the motion at defendant's request, stating that the trial court erred when it sent a note to the jury instructing them to continue deliberating after they indicated that they had not reached a verdict. Citing the fact that it had discussed sending the note with both sides before doing so, the court reiterated its denial of defendant's motion for a new trial. Following a hearing in aggravation and mitigation, the trial court sentenced defendant to 75 years in the Illinois Department of Corrections. Defendant's timely appeal followed.

Defendant first contends that the trial court erred in finding that there was an independent basis for Medrano's in-court identification sufficient to outweigh the influence of an impermissibly suggestive lineup. In this regard, defendant claims that the in-court identification "was a 'fruit' of the improper lineup identification."

■ Once an out-of-court identification has been found to be unnecessarily suggestive and, therefore, inadmissible, the State has the burden of proving by clear and convincing evidence that the in-court identification is predicated upon observations made of defendant which are independent and uninfluenced by the inadmissible identification. (*People v. Reyes* (1982), 108 Ill. App. 3d 911, 439 N.E.2d 1089.) The determinative factors as to whether there was an independent origin are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty with respect to the identification; and (5) the lapse of time between the crime and the confrontation. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

■ Applying these factors to the present case reveals the following. First, Medrano's testimony clearly demonstrates that he had sufficient opportunity to view defendant. Medrano stated that when defendant walked into the tavern, he glanced up at him. When defendant then asked about the washroom, Medrano turned and looked at defendant once again and saw him reach into his jacket and pull out a gun. When defendant and his companion started shooting,

Medrano dove under the pool table, but positioned himself so that he could see defendant's face as he walked up to Ayala and shot him at close range. In addition, the room was well lit by natural light streaming through a wall of glass block windows as well as by artificial lighting.

Second, Medrano's testimony indicates that once he was under the table, his attention was riveted on defendant. Prior to the shooting, the evidence indicates that Medrano had focused his attention directly on defendant and could describe his movements in detail. Third, Medrano described defendant as between 140 and 160 pounds, with a small mustache, thin, nicely shaped hair and wearing a green army jacket. We do not find that the fact that Medrano could not be more definite about defendant's height or weight or describe his clothing in more detail diminishes the accuracy of the description he was able to give. Fourth, with respect to certainty, Medrano expressed absolute certainty at the photo array that defendant was the murderer. Finally, although over two years had elapsed between the shooting and the in-trial identification, only one month had elapsed between the shooting and the photo identification of defendant by Medrano. Accordingly, we conclude that the trial court properly found that Medrano had an independent basis to observe defendant at the time of the shooting incident, and the in-trial identification was properly admitted.

■ Defendant next contends that the trial court erred in denying him a continuance to obtain an arrest photo of Betty Gibson from the St. Louis police with which to impeach the testimony of Officer Dodson who testified that the woman he arrested in the motel room and the woman posing with defendant in a photograph found in the motel room were both Betty Gibson. Defendant claims that the woman in the motel room photograph was Viola Harmon, defendant's common law wife.

The decision as to whether to grant or to deny a continuance is discretionary with the trial court and will not be disturbed absent a showing that the court abused its discretion. (*People v. Pearson* (1981), 102 Ill. App. 3d 732, 430 N.E.2d 304.) In arriving at its determination, it is incumbent upon the trial court to consider whether denial of the continuance will either impede defendant's defense or prejudice his rights. *People v. Petrovic* (1982), 102 Ill. App. 3d 282, 430 N.E.2d 6.

■ In the present case, after extensive discussion with respect to the request for continuance, the trial court found that the issue as to whether the woman arrested in St. Louis and the woman in the photograph with defendant were the same person was collateral to the is-

sues before the court, and, thus, irrelevant. We concur. As stated by the trial court, the importance of the photograph was that it was a photo of defendant and that it was found in the same room as the .357 revolver. There is no dispute as to either of these facts. Further, we note that defendant had ample opportunity to impeach Officer Dodson's testimony when he put Viola Harmon on the stand who testified that she was not the female arrested in the motel, but that she was the female in the photograph found in the motel room. Thus, the jury was aware that Officer Dodson had mistakenly identified the woman arrested as the woman in the motel room photograph. Therefore, we find that the trial court properly denied defendant's motion for a continuance.

■■ Defendant further contends that the trial court improperly denied his hearsay objections to admission into evidence of the license plates and temporary registration application which were made out to defendant and found on the impounded car. In February 1981, Officer McCarthy found a car matching the descriptions given by Medrano and Saucedo of the getaway car and displaying license plates corresponding to the number given to the police by Stringer. Upon checking the plates, McCarthy found that they were registered to defendant for use on a different car. McCarthy also found an Illinois registration transfer application on the windshield of the car, dated January 13, 1981, and listing defendant's name and address.

It is well established that records kept by persons in public office which they were required to maintain either by statute or the nature of their business constitute an exception to the hearsay rule. (*People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205, 190 N.E.2d 780.) In the present case, it is undisputed that the license plates and registration transfer application constitute such records, and, accordingly, we find that they were properly admitted into evidence.

■■ Next, defendant argues that the trial court erroneously admitted testimony as to defendant's presence in California at the time of his arrest when the requisite foundation for such testimony had not been laid. Defendant claims that the testimony prejudiced him by suggesting that he had fled to California to avoid arrest. Prior to trial, defendant moved *in limine* to exclude testimony that defendant was arrested in California and extradited to Illinois. The trial court denied the motion with respect to the fact that defendant was arrested in California, but granted the motion to exclude use of the term "extradition" and "the facts of any legal proceedings to transfer the defendant from California to Illinois."

Generally testimony as to the surrounding circumstances and events leading up to an arrest is admissible. (*People v. McShan* (1975), 32 Ill. App. 3d 1068, 337 N.E.2d 263; *People v. Bolton* (1974), 18 Ill. App. 3d 512, 310 N.E.2d 22.) In the present case, Officer John Dahlberg of the Chicago police department testified that in December 1981, while armed with a warrant for defendant's arrest, he flew to California, took defendant into custody at the Los Angeles County Authorities, and brought him back to Chicago. In our opinion, the trial court properly admitted Officer Dahlberg's testimony as a description of the circumstances surrounding defendant's arrest and that the description did not prejudice defendant.

■ Next, defendant contends that the trial court committed reversible error when it granted the State's motion to amend the transcript of Medrano's testimony to read "can" rather than "can't" with respect to Medrano's ability to see defendant at the time of the shooting based upon the court's personal recollection that Medrano had said "can." Defendant argues that the law does not permit such amendment to be made based solely on the court's personal recollection when the amendments contradict the existing contents of the record. Although defendant has stated the law accurately, we find that he has misapplied the law to the facts at bar.

As stated by defendant, provided that an amendment to a record of proceedings does not impeach or contradict the contents of the record, the court may allow the amendment based solely upon its own recollection. (*People v. Brownstein* (1982), 105 Ill. App. 3d 459, 434 N.E.2d 505; *People v. Henderson* (1977), 54 Ill. App. 3d 46, 369 N.E.2d 556.) In the present case, defendant argues that the word "can" directly contradicts the word "can't" and, therefore, the amendment should not have been allowed. In our view, defendant's narrow perspective of the contradictory nature of the amendment distorts the rule. Instead, the proper perspective is to view the amendment in the context of the entire record to determine if it contradicts the evidence as a whole. In our opinion, when viewed in such a manner, the amendment resolves, rather than creates, any contradictions.

In support of our position that the amendment resolves contradictions, we note that prior to trial, Medrano unequivocally identified defendant from a photo array and later identified defendant at trial. Moreover, on direct, when asked if he could see the victim from his position under the pool table, Medrano answered, "Yes sir." Also, when asked, "Were you able to see [defendant's] face when he was doing that?", Medrano answered, "I see his face. I see his left side and I see his hair, you know." Further, in response to questions on

redirect about his position under the pool table, Medrano stated, "And I recall this as I do the other and I can see his face from here because I saw him when he shot to the close range."

In addition, as noted by the trial court, it was quite clear at trial that the defendant's theory of defense was that Medrano could not have seen him from his position under the pool table. It was equally clear from Medrano's testimony as a whole that his view of the facts was contrary to defendant's theory. Thus, based upon the record as a whole and also noting the trial court's observations that Medrano spoke "in a broken tongue," easily misinterpreted by the court reporter, we find that the amendment was not contradictory to the record and that the trial court properly granted the motion to amend the record based upon its own recollection.

■ Next, defendant argues that he was deprived of his right to a fair trial through the incompetence of his trial counsel and cites 15 instances of allegedly prejudicial behavior. Pursuant to *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, in order to demonstrate ineffectiveness of counsel, defendant must prove that: (1) counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot have produced a just result; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In reviewing the record with respect to an allegation of ineffectiveness of trial counsel, the appellate court will not examine those areas involving the exercise of judgment, trial tactics or strategy. Instead, it will consider the totality of the circumstances in determining the competency of counsel (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213), cognizant of the axiom that counsel is "presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment" (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052).

In the present case, defendant has presented an extremely detailed analysis of the alleged errors made by his trial counsel. We have carefully reviewed these allegations in light of the totality of the evidence and conclude that defendant has failed to establish the requisites set forth in *Strickland*. To the contrary, it is our opinion that defense counsel represented defendant with skilled diligence and acted in the best interests of defendant throughout the proceedings.

■ Finally, defendant asserts that the State's comments during closing and rebuttal arguments were prejudicial and denied him his right to a fair trial. In response, the State contends that the closing

and rebuttal comments were proper as either fair comment on the evidence or as invited reply.

It is axiomatic that a prosecutor is allowed great latitude in making his closing argument, and, absent a clear abuse of discretion, the trial court's determination as to the propriety of the comments will not be disturbed on review. (*People v. Maldonado* (1981), 101 Ill. App. 3d 948, 428 N.E.2d 1087.) Moreover, prosecutorial comments which are either a comment on the evidence or are an invited reply to comments made by defense counsel are proper. *People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 385 N.E.2d 904.

Upon reviewing the five cited instances of alleged improper prosecutorial remarks, we conclude that all of the remarks were either legitimate comments on the evidence or invited reply, and, thus, did not constitute reversible error.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'CONNOR and QUINLAN, JJ., concur.